UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAYMENT ALLIANCE INTERNATION, INC., <br><br>                                    Plaintiff, <br><br>      - against - <br><br>MANUEL FERREIRA, <br><br>                                  Defendant. | Index No.: 07 CIV 8685 (B.S.J.) |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
PAYMENT ALLIANCE INTERNATIONAL, INC.'s
APPLICATION FOR A PRELIMINARY INJUNCTION**

KAUFF McCLAIN & McGUIRE LLP
950 Third Avenue – 14TH Floor
New York, New York 10022
Tel. (212) 644-1010

Attorneys for Plaintiff
Payment Alliance International, Inc.

4849-3048-2689.3

## PRELIMINARY STATEMENT[1]

Payment Alliance International ("PAI") respectfully submits this reply memorandum of law in further support of its application under Fed. R. Civ. P. 65 for a preliminary injunction enjoining Manuel Ferreira from, *inter alia*, working for Cynergy Data, Inc. ("Cynergy Data") in violation of his post-employment contractual obligations to PAI.

As set forth more fully below, Ferreira incredibly contends that he was "forced" to execute his employment agreement with restrictive covenants and that the covenants were not entered into as part of PAI's acquisition of EDR (his former employer), despite the *undisputed* facts that: Ferreira was an owner of EDR who held 15,000 shares of its non-publicly traded stock, the acquisition closing documents specifically precondition the corporate acquisition on Ferreira executing the covenants, Ferreira was paid $300,000 in consideration for the covenants (the most consideration after EDR's founders), and he was one of a very few EDR personnel who were permitted to convert their EDR stock to PAI stock. Next, Ferreira submits affidavits that concentrate on only one trade secret within Ferreira's possession (the Application project), and provide sweeping, conclusory allegations concerning it at best. Indeed, the affidavits wholly ignore the multitude of trade secret and confidential/proprietary information within Ferreira's knowledge as Senior Vice President of Operations that amply support enforcement of the covenant.

---

[1] The facts set forth in this Memorandum of Law are taken directly from the Verified Complaint and the Reply Declarations of Gregory Sahrmann and Dawn Murray.

4836-9349-3505.1

# ARGUMENT

I. <u>The "Sale of Business" Analysis Should Be Employed to Assess the Covenant</u>

Contrary to Ferreira's self-serving, disingenuous protestations, Ferreira was an owner of EDR and was not "forced" to execute an employment agreement with restrictive covenants and convert his EDR shares to PAI shares. He did so freely and with great enthusiasm, and in exchange for hundreds of thousands of dollars.

At the time PAI acquired EDR, Ferreira owned 15,000 EDR shares. Those shares were not available for purchase on the open market. He was, in all respects, an owner of the company who executed a Written Consent of the Stockholders of Electronic Data Resources, Inc. authorizing the acquisition. The conversion of EDR stock was a significant benefit offered to only a handful of EDR employees. Ferreira executed a Contribution Agreement, which provided for the EDR stock conversion and in which he acknowledged that he was a "sophisticated investor" and that he "determined that such investment in the Class A Stock [of PAI] is suitable" for him. In addition to the converted stock, Ferreira received a payment of tens of thousands of dollars. The total compensation paid to him was approximately $300,000. *Only the three founders of EDR received more compensation than Ferreira as a result of the sale.* More than that, Ferreira was an enthusiastic participant in the acquisition, and decided, *of his own volition*, to take 85% of the sale proceeds in PAI stock (as opposed to an increased cash payment), rather than the suggested amount of 50%.

Although PAI does not believe the distinction will alter the conclusion here, the present facts compel the Court to apply the "sale of business" analysis to his restrictive covenant. That Ferreira would cite the <u>Misys</u> case to support his contrary position is puzzling. Its facts are on all-fours with those of this case, and fully support the contention that Ferreira's covenant was

executed in the context of the sale of a business. In <u>Misys Int'l Banking Systems, Inc. v. TwoFour Systems</u>, LLC, 800 N.Y.S.2d 350 (table), 2004 WL 3058144 (Sup. Ct., N.Y. Cnty., Commercial Div., Nov. 23, 2004) (Fried, B.J.), the court preliminarily enjoined two former employees from competing against Misys, which purchased the stock of the two employees' former employer. At the time of the acquisition, the two former employees owned 0.9% and 3.7% of their former employer. The two employees entered into "Employment and Non-Competition Agreements" as an "'inducement' to the sale of business." Notwithstanding the employees' minority ownership interest, and that the covenant was set forth in an employment agreement (rather than the closing documents), the court treated it as a "sale of business" covenant.

Here, as in <u>Misys</u>, Ferreira owned approximately .8% of the shares in EDR and entered into an employment agreement containing covenants barring competition as an inducement to, and precondition of, PAI's acquisition of EDR. Ferreira also was provided a cash payment and other inducements to approve the sale and agree to the covenants and, unlike in <u>Misys</u>, the PAI-EDR acquisition closing documents identify Ferreira by name, and precondition the purchase of EDR by PAI on his execution of the employment agreement with covenants. As set forth in the Verified Complaint, one of the key reasons PAI acquired EDR was to obtain its executive talent pool, including Ferreira, to serve as the basis for future growth and acquisition, and to ensure against that talent pool competing against PAI and rendering its investment worthless. If Ferreira and other key employees did not agree to continued employment with PAI following the acquisition, and did not agree to refrain from competing against it following termination from PAI, PAI would not have acquired EDR. Ferreira knew this, and his agreement to execute an employment agreement containing a non-competition covenant was a condition of closing

specifically set forth in the EDR purchase agreement.

The employment agreement with covenants undoubtedly were entered into as part of a sale of business, and thus the Court should assume irreparable harm on that basis.

II.     The Doctrine of Inevitable Disclosure Is Sanctioned Because Ferreria is a Former High-Level Executive Who Possesses Knowledge of PAI's Trade Secrets.

Defendant's memorandum of law in opposition to Plaintiff's application misstates the law of inevitable disclosure. Application of that doctrine decidedly has not been circumscribed to protect solely an employer's "high-tech" information, or to apply solely to former employees who possess engineering, computer programming, or other technical skill (which presumably may permit the former employee to, by themselves, re-engineer a trade secret). Rather, courts have relied on inevitable disclosure to enjoin competition by non-technical, high-ranking employees who cannot independently re-engineer technical processes.

In Estee Lauder Companies, Inc. v. Batra, 430 F. Supp.2d 158 (S.D.N.Y. 2006), the court enforced a covenant not to compete and issued a preliminary injunction barring a former *marketing* employee from commencing employment with a direct competitor. Significantly, the Court found irreparable harm on the basis of the inevitable disclosure doctrine because *although the defendant contended that he did not know any more about the specific components or technologies of Estee Lauder products than the average consumer, he was "knowledgeable about confidential products currently under development and product innovations scheduled for the coming years..." as well as "the stage of development of products in the pipeline."* (emphasis added). Similarly, in Global Telesystems, Inc. v. KPNQwest, N.V., 151 F. Supp.2d 478, 482 (S.D.N.Y. 2001), the court enjoined a former *Chief Financial Officer* from working for a competitor and providing *professional services* because although the court did "not question his integrity, [the court] believe[d] there [was] a continuing danger that the [Chief Financial Officer]

may unintentionally transmit information gained through his association with GTS during his day-to-day contact with KPNQ." Id.

Here, Ferreira possesses detailed, technological knowledge of PAI's Application, as well as other trade secrets and confidential information (discussed below). As Senior Vice President of Operations, Ferreira actively contributed to the design and implementation of the Application, a secret project for which only 7 employees had password access. That he did not serve as the computer programmer for the Application is of no moment; he possesses detailed knowledge of the Application's design, configuration, capabilities, specifications, and processes and, in fact, contributed many ideas toward the creation of the Application.

Most disturbingly, Ferreira was present at an extensive review of the Application shortly before his resignation. This detailed review of the new system and its processes was part of a key staff review meeting which Ferreira held, which lasted one and one-half hours, and which included "screen shots" and demonstrations of critical system components. This system review included considerable discussions about various components of the Application's design, in which Ferreira was an active and engaged participant and gave numerous directions regarding the system.

The sole support for Ferreira's contention that his involvement in the development of the Application was "quite limited" is that he purportedly participated in only a few of the many "conference calls" concerning the Application. He fails to provide the Court the details of his meaningful work on the project outside of conference call participation, including his creation and/or contribution to certain design elements of the Application, and his participation in systems development meetings with Dawn Murray (the architect of the Application) and other technical employees, during which key intellectual components of the Application were discussed and

worked upon. Indeed, Murray regularly reported directly to Ferreira and shared with him detailed information concerning the development of the Application.

Disturbingly, Ferreira was present at an extensive review of the system shortly before his resignation. This detailed review of the new system and its processes was part of a key staff review meeting which he held. The meeting lasted one and one-half hours, and included "screen shots" and demonstrations of critical system components, as well as considerable discussions about various components of the Application's design.

PAI unquestionably has satisfied its burden under EarthWeb, which provides that a court will issue a preliminary injunction invoking the inevitable disclosure doctrine where: (i) the employers in question are direct competitors providing the same or very similar products or services; (ii) the employee's new position is nearly identical to his old one (such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer); and (iii) the trade secrets at issue are highly valuable to other employers.

Defendant concedes, as he must, that PAI and Cynergy Data are direct competitors, and he does not contest that he will be employed by Cynergy Data in a position nearly identical to his position with PAI. Thus, Ferreira is left with arguing that PAI's trade secrets that he is knowledgeable about are not valuable to other employers in the electronic payment processing industry. In this regard, Ferreira focuses his arguments completely on PAI's Application, and wholly ignores the multitude of other PAI trade secrets and proprietary/confidential information in Ferreira's possession.

At the outset, as set forth more particularly in the Reply Affidavit of Gregory Sahrmann, the Application's most significant advancements are that it (i) processes both electronic *and*

*manual* (hard copy) merchant application *and has the merchant account operational – so that the merchant may begin accepting POS credit/debit card payments – within two hours after an electronic application is submitted,* and (ii) dramatically reduces the time, labor, and expertise required to enter, approve and set up a merchant account. Cynergy Data's affidavits state that its system *approves* merchant account applications at the top of every hour (we are unsure whether this means that applications are approved within an hour). Notably, Cynergy Data's Chief Information Officer did not swear that its VIMAS system brings merchant account live and operational within 2 hours, as does the Application.[2] Even if it does, the Application results in numerous technological, labor, and cost efficiencies (as described in the moving papers, including its proprietary work queues and work rules), some or all of which indisputably would be valuable to Cynergy Data and could be imported piecemeal.

The Application, standing alone, demands the issuance of a preliminary injunction under the theory of inevitable disclosure. Nevertheless, PAI possesses significant other trade secrets and confidential information about which Ferreira has intricate knowledge. We respectfully refer the Court to the Reply Affidavit of Gregory Sahrmann for a full recitation of these facts, but wish to highlight certain of the information here:

- PAI has preconfigured in a proprietary manner a POS terminal with various merchant "add-ons," including merchant access to loyalty reward programs, gift cards, electronic check processing, and other functions. Ferreira has detailed knowledge of this system, which provides PAI a competitive advantage.

- PAI maintains an "activation system," which monitors and controls the activation process for merchant accounts by loading new accounts for installation, creating work queues and work rules that route new accounts to the appropriate installers, and allows installers to track and report on installation and set-up matters. This system delivers improved activation rates, the critical metric in measuring the

---

[2] Interestingly, Cynergy Data's website states that that after an application is submitted "a representative will contact you within 24 hours." (*See* www.Cynergydata.com/index.cfm?tdc=dsp&page=merchant_account). If Cynergy Data was able to bring a merchant "live" in less than 2 hours, it surely would boast of that on its website, and Cynergy Data surely would have made that clear to this Court.

success of the new account processing process. These operational details, which Ferreira possesses, are strictly confidential at PAI and would severely damage the company if discovered by a direct competitor.

- Ferreira has detailed knowledge of PAI's contracts with its independent sales forces it uses to sell POS and other electronic payment systems services, including pricing, sales incentives, and sales programs. Accordingly, he has confidential information concerning PAI's sales strategies, merchant pricing, and ancillary product pricing, among other things.

- Other confidential information possessed by Ferreira includes PAI's future technology plans, PAI's short-term and long-term business strategy and marketing plans, PAI budgets, financial projections, investments, and plans to continue and expand operations, The identify and contact information of PAI vendors, independent sales organizations, customers and potential customers, PAI's contracts with customers, vendors, and independent sales organizations.

Notably, neither of Ferreira's affidavits address any of the protectible confidential information referenced in the Verified Complaint other than the Application.

III.     The Covenant is Enforceable, and PAI is Likely to Succeed on the Merits of Its Claim

Finally, Ferreira's contentions that the covenant is unenforceable under New York law are nothing more than a rehashing of his fallacious argument that he does not possess detailed knowledge of the Application and the Application is not a trade secret. As set forth fully above, he does, and it is. Most notably, Ferreira once again, in making this argument, fails to address the multitude of other PAI trade secret and proprietary/confidential information in his possession that also would be valuable to Cynergy Data if disclosed to it. It is beyond dispute that trade secrets and other confidential and proprietary information are legitimate, protectible interests justifying the enforcement of a restrictive covenant. The multitude of such information disclosed to, and used by, Ferreira in his Senior Vice President of Operations position compels enforcement of the covenants.

## CONCLUSION

For all the foregoing reasons, and for those set forth in PAI's moving papers, the Court should issue the preliminary injunction as set forth in the Order to Show Cause submitted by plaintiff.

Dated: October 18, 2007
      New York, New York

                          Respectfully submitted,
                          KAUFF McCLAIN & McGUIRE LLP
                          Attorneys for Plaintiff
                          Payment Alliance International

                          By: /s/ Lyle S. Zuckerman
                              Lyle S. Zuckerman (LZ 6523)

                          950 Third Avenue – 14th Floor
                          New York, New York 10022
                          (212) 644-1010