UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAYMENT ALLIANCE INTERNATIONAL, INC., <br><br>                            Plaintiff, <br><br>        - against - <br><br>MANUEL FERREIRA, <br><br>                            Defendant. | Case No. 07 CIV 8685 (BSJ) <br><br>DECLARATION OF <br>GREGORY W. SAHRMANN |

       Gregory W. Sahrmann declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

I.    Introduction

       1.    I am the Chief Operating Officer of Payment Alliance International, Inc. ("PAI"), and am familiar with the facts and circumstances set forth in this Declaration based on my personal knowledge, and/or my review of documents regularly maintained by PAI in the regular course of its business. I make this Declaration in support of PAI's Application for a Preliminary Injunction with Temporary Restraints and to rebut the inaccuracies contained in affidavits submitted by Manuel Ferreira ("Ferreira").

       2.    While PAI's moving papers may have emphasized Ferreira's detailed knowledge of its newly developed electronic payment processing service (referred to herein as the "Application" or "COLTS"), PAI also set forth in the Verified Complaint that Ferreira has extensive knowledge of other PAI trade secrets and confidential information, including other technology systems, which support enforcement of the covenant not-to-compete.

3.  Additionally, Ferreira was not "forced" to execute an employment agreement with restrictive covenants and convert his EDR shares. He did so freely, and in exchange for hundreds of thousands of dollars.

II.  PAI's Acquisition of EDR

4.  At the time PAI acquired EDR, Ferreira owned 15,000 shares of EDR. Those shares were not available for purchase on the open market. He was, in all respects, an owner of the company who executed a Written Consent of the Stockholders of Electronic Data Resources, Inc. authorizing the acquisition, a copy of which is attached as Exhibit A.

5.  Ferreira's self-serving statement that he was "in essence forced to convert [his] EDR stock into PAI stock" is false. (Ferreira Supp. Aff. ¶ 5).

6.  The conversion of EDR stock was a significant benefit offered to only a handful of EDR employees. Ferreira executed a Contribution Agreement, attached hereto as Exhibit B, which provided for the EDR stock conversion and in which he acknowledged that he was a "sophisticated investor" and that he "determined that such investment in the Class A Stock [of PAI] is suitable" for him. In addition to the converted stock, Ferreira received a payment of tens of thousands of dollars. The total compensation paid to him was approximately $300,000. *Only the three founders of EDR received more compensation than Ferreira as a result of the sale.*

7.  More than that, Ferreira was an enthusiastic participant in the acquisition, and decided, *of his own volition*, to take 85% of the sale proceeds in PAI stock (as opposed to an increased cash payment), rather than the suggested amount of 50%.

8. Additionally, subsequent to the transaction, PAI gave Ferreira a significant promotion, a substantial salary increase (20%), and 270 shares of additional PAI stock. These benefits demonstrated the importance of his role in PAI.

9. Ferreira, in his capacity as a senior officer of PAI, participated in the 2007 senior level management reviews and business discussions held in Louisville, Kentucky and Florida, during which his input and recommendations were sought and acted upon.

10. As set forth in the Verified Complaint, one of the key reasons PAI acquired EDR was to obtain its executive talent pool, including Ferreira, to serve as the basis for future growth and acquisition, and to ensure against that talent pool competing against PAI and rendering its investment worthless. If Ferreira and other key employees did not agree to continued employment with PAI following the acquisition, and did not agree to refrain from competing against it following termination from PAI, PAI would not have acquired EDR. Ferreira knew this, and his agreement to execute an employment agreement containing a non-competition covenant was a condition of closing specifically set forth in the EDR purchase agreement.

III. Ferreira's Knowledge of, and Participation in the Development of, the Application

11. Ferreira was PAI's Senior Vice President of Operations and reported directly to me, the Chief Operating Officer. Ferreira has intimate knowledge of virtually all aspects of PAI's business, including the Application, which is by far the most significant, proprietary, time-consuming, and expensive technological advancement PAI has undertaken since it acquired Ferreira's former employer, Electronic Data Resources ("EDR").

12. Dawn Murray is the architect of the Application. She reported directly to Ferreira, who was responsible for supervising Murray with respect to her Application-

4832-5158-4001.2

development responsibilities. Indeed, the roll-out of the Application was among Ferreira's 2006 performance goals.

13.     In addition to managing Murray, Ferreira actively contributed to the design and implementation of the Application, and was one of approximately six PAI employees who possessed a password to access the Application. Indeed, Ferreira was the most senior officer with password access to the Application and was the only PAI officer with direct responsibility for the design and implementation of the Application. He possesses detailed knowledge of the Application's design, configuration, capabilities, specifications, and processes and, in fact, contributed many ideas toward the creation of COLTS.

14.     Ferreira swears in his Supplemental Affidavit that his involvement in the development of the Application was "quite limited." To support that statement, Ferreira references only the number of "conference calls" in which he participated concerning COLTS. (Ferreira Supp. Aff. ¶ 1). Ferreira fails to disclose, however, that the COLTS architect (Dawn Murray) regularly reported directly to him, and he regularly reported directly to me, the status of COLTS's development, including design details and the timeline for its implementation.

15.     Ferreira was present at an extensive review of the system shortly before he resigned. This detailed review of the new system and its processes was part of a key staff review meeting which he held, lasting one and one-half hours, and which included "screen shots" and demonstrations of critical system components. This system review included extensive discussions about various components of the Application's design, in which Ferreira was an active and engaged participant and gave numerous directions regarding the system.

16.  It is patently absurd that in his role as Senior Vice President of Operations, Ferreira would not be able to "transfer any meaningful information to [a direct competitor]" regarding the Application. To the contrary, he had: overall responsibility for every aspect of the Application (including its key functions, work flow, user screens, business rules, etc.); overall responsibility for the wholesale restructuring of PAI's merchant application processing group in conjunction with the transition to the Application; and reported the details of that project directly to the COO as part of his regular job duties.

17.  The Application will be implemented in phases over the next several months. Contrary to Ferreira's misleading representations, the first phase will be implemented shortly, and the first entry of merchants through the system began during the week of October 8.

IV.  The Application Performs At Least The Most Important Function More Efficiently Than Cynergy's Systems

18.  Comparing the Application to Cynergy's VIMAS is an inaccurate and confusing comparison because, in addition to the Application, PAI has numerous systems other than the Application that together would equal or exceed the functionality of VIMAS. The Application, however, is a significant improvement in the area of new account processing, which extends beyond the simple functionality of an automated account set up system. Rather, it incorporates new and improved data entry methods, application imaging, provides for reduced processing time, reduced labor time and expertise, and incorporates proprietary work rules and work queues.

19.  Significantly, the Application can process a merchant's electronic or manual application and have the merchant account operational – so that the merchant may begin accepting POS credit/debit card payments – within two hours after the electronic or manual

application is submitted, thereby dramatically reducing the time, labor and expertise required to enter, approve and set up the account. Notably, Affiant Andres Ordonez admits in his affidavit that VIMAS takes longer to process manually submitted applications. (Ordonez Aff. ¶ 6).

20. This efficiency, standing alone, gives PAI a significant competitive advantage over Cynergy Data. And, contrary to the impression conveyed by Ferreira that Cynergy Data would be required to import the entire Application to obtain its benefits, the Application's design, processes, business rules, work queues, and other key components could yield benefits to Cynergy Data, which Ferreira's non-compete agreement was designed to protect against.

21. The key aspects of the Application are not in the source coding, but rather in the intellectual processes that drive the system. PAI has invested considerable time, money, and efforts (and far in excess of the actual system development cost) to design the system to support its in-house and third-party sales force resulting in significant cost savings and other competitive advantages. And Ferreira played a key role in that intellectual process.

22. The affidavit submitted by Cynergy Data focuses on its VIMAS system, which is an automated customer service system that numerous competitors of Cynergy Data and PAI possess (and, in fact, PAI's current systems together performs virtually all of the functions of the VIMAS system). The Application, however, represents a significant technological step beyond these other systems in the critical area of new account processing. The differences in account processing among electronic payment services competitors, including with respect to the speed, accuracy and cost of processing separates the competition from one another, often determining a company's ability to attract and retain business.

V.    Ferreira's Vast Knowledge of Other PAI Trade Secrets

23.    In addition to Ferreira's knowledge of the Application, he was intimately familiar with other PAI trade secrets and proprietary information.

24.    For example, PAI has preconfigured in a proprietary manner a point of sale terminal manufactured by PrimeTrex. This terminal is a low-cost, reliable piece of hardware that PAI configured with various merchant "add-ons," including merchant access to loyalty reward programs, gift cards, electronic check processing, and other functions. Ferreira has detailed knowledge of this system, which provides PAI a competitive advantage.

25.    Ferreira also has detailed knowledge of PAI's activation system, which monitors and controls the activation process for merchant accounts. This system loads new accounts for installation, creates work queues and work rules that route new accounts to the appropriate installers, allows the installers to track and report on set-up issues and effectiveness, and ultimately deliver improved activation rates (the critical metric in measuring the success of the new account processing process). These operational details are strictly confidential at PAI and would severely damage PAI if discovered by a direct competitor.

26.    Next, PAI uses both an in-house employee sales force, and independent sales organizations ("ISOs"), to sell its services. Ferreira has detailed knowledge of PAI's contracts with its third party sales force provider, including with respect to pricing and sales incentives and other sales programs. Additionally, Ferreira has detailed knowledge of PAI's direct sales office structure, employee salary and incentive pay information, the overall cost of acquisition for new accounts generated by the group, the key success metrics for running an in-house sales organization, and other non-public information. His working knowledge of PAI's pricing,

operations and support structures would be of significant value to Cynergy Data. Moreover, his relationships and goodwill with sales managers, representatives, and ISOs would be of great worth to any competitor of PAI, including Cynergy Data.

27. Contrary to his assertions, Ferreira had daily contact with PAI's direct sales force and ISOs. He regularly had access to sales production statistics and the names and contact information of all sales representatives. His job as SVP of Operations required that he have intimate knowledge of PAI's sales strategies, its compensation programs, merchant pricing, ancillary product pricing, and commission programs. This information would be valuable to Cynergy Data and Ferreira inevitably would reveal it, directly or indirectly, to Cynergy Data in his role or future role as Chief Operating Officer.

28. Ferreira also has detailed knowledge regarding PAI's contracts with Global Processing Systems, a large electronic payment service provider, including cost and pricing data, which non-public information would be valuable to PAI's competitors.

29. Additionally, as I verified in the Verified Complaint, Ferreira worked on a day-to-day basis with other trade secrets and confidential and proprietary information of PAI, including:

- PAI's future technology plans;
- PAI's short-term and long-term business strategy and marketing plans;
- PAI budgets, financial projections, investments, and plans to continue and expand operations;
- The identify and contact information of PAI vendors, independent sales organizations, customers and potential customers;
- PAI's contracts with customers, vendors, and independent sales organizations, which agreements set forth prices, material terms, and designs of PAI's products and services; and

- Information concerning salaries and other terms and conditions of employment of members of PAI's Operations Department

30. Notably, neither of Ferreira's affidavits address any of the protectible confidential information referenced in the Verified Complaint other than the Application.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 18, 2007.

_____
Gregory W. Sahrmann