UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAYMENT ALLIANCE INTERNATIONAL, INC., | ) |
| | ) Index No.: 07 CIV 8685 (B.S.J.) |
| | ) Hon. Barbara Jones |
| Plaintiff, | ) |
| | ) |
| - against - | ) |
| | ) |
| MANUEL FERREIRA, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

**DEFENDANT MANUEL FERREIRA'S SUPPLEMENTAL BRIEF IN OPPOSITION TO
PLAINTIFF PAYMENT ALLIANCE INTERNATIONAL, INC.'S APPLICATION FOR
A PRELIMINARY INJUNCTION WITH TEMPORARY RESTRAINTS**

JAFFE RAITT HEUER & WEISS, P.C.
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
248.351.3000

Attorneys for Defendant
Manuel Ferreira

## INTRODUCTION

Defendant Manuel Ferreira, files this Supplemental Brief in accordance with the request he made in open court to address some additional factual issues raised by Plaintiff's Reply Brief, as well as to highlight for the Court, prior to a ruling on Plaintiff's preliminary injunction request, the key legal standards which New York courts are bound to consider before enforcing a non-compete.

## ADDITIONAL FACTUAL BACKGROUND

The EDR-PAI transaction was not a sale of the company. *See* Affidavit of Manuel Ferreira, attached as Exhibit A. In essence, new equity investors, purchased the interest of the original venture capitalists. *Id.* The original venture capitalists were the ones who sold their interest in the business.

Ferreira was not one of those investors. Employees, such as Ferreira, merely continued their employment status with EDR whose name was changed to PAI following the merger. *Id.* Ferreira had no role to play in the merger negotiations, was not on the Board of Directors of EDR, was not consulted about the merger and was treated, for all intents and purposes, as an employee of EDR. *Id.* In fact, Ferreira was not even a shareholder of EDR until the merger took place. *Id.* As part of his salary and total compensation, he was given stock options to acquire shares of EDR. *Id.* Only when the merger was consummated did those stock options automatically convert into shares of the company. *Id.* In connection with the merger, 75% of Ferreira's EDR shares were converted into PAI shares. *Id.* The total amount of cash Ferreira received in connection with the merger was $40,069. *Id.*

Paragraph 7.7 of the Merger Agreement executed by EDR and PAI contains a non-compete for the persons who really were selling their shares in EDR in connection with the sale of a business. *Id.*; *see* Merger Agreement attached as Exhibit A to Manuel Ferreira's Affidavit. Ferreira was not one of the "Management Selling Shareholders" as that term was defined in the

2

Merger Agreement. Rather, Ferreira merely continued his employment relationship. The non-compete sought to be enforced here is found in Ferreira's Employment Agreement, not the Merger Agreement and must be evaluated accordingly.

### *The Colt Software System*

It is undisputed that Dawn Murray was the architect of the COLT system. Though she did report directly to Ferreira in his capacity as Senior Vice President of Operations, Murray was in charge of the "nuts and bolts" of the operation and its design. *See* Affidavit of Manuel Ferreira. Ferreira only provided limited non-technical suggestions on functional items that should be included in the COLT software system. *Id.*

It is undisputed that Ferreira is incapable of sharing any programming information with Cynergy or otherwise duplicating any of the programs or functions which the COLT software system performs. *Id.* Ferreira's involvement was not at the technical or source code level and therefore he is not able to misappropriate PAI's technology even if he wanted to. *Id.*

Sahrmann's description of the COLT software system in his Reply Declaration is inaccurate. *Id.* The COLT software system does not convert manually submitted information into electronic information. *Id.* Rather, human beings input the information manually into COLT to convert it. *Id.* VIMAS handles these matters in the exact same way and thus there are no software efficiencies of COLT over VIMAS. And, VIMAS does get merchants boarded and processing at the top of every hour for those merchants whose information is submitted electronically which is, as pointed out before, almost 90% of Cynergy's merchants. *Id.* From Cynergy's perspective, VIMAS is vastly superior to the "proposed" COLT system, and so Cynergy has no interest in misappropriating all or any part of it.

### *Additional "Trade Secrets" of PAI*

Though not raised in PAI's initial motion and supporting memorandum of law, Sahrmann suggests, in his Reply Declaration, that PAI has a proprietary point of sale terminal that

constitutes a trade secret. A proprietary terminal in this industry is nothing new. *Id.* In fact, Cynergy is already working with a German company to create its own proprietary terminal.

Moreover, Cynergy, like PAI, has an in-house sales force and independent sales organizations selling Cynergy's services. Cynergy is far larger than PAI and already has in place form agreements and a salary and pay structure which it has used for years. There is nothing about PAI's relationships with its sales teams that constitutes a trade secret. In addition, Cynergy's pricing is, logically, dependent upon its relationship with its business partners who are different than those used by PAI, and so information concerning PAI's pricing would be irrelevant to Cynergy.

**ARGUMENT**

### I.    PAI <u>MUST</u> PROVE "IRREPARABLE HARM" IN ORDER TO RECEIVE A PRELIMINARY INJUNCTION

A demonstration of irreparable harm is "**the single most important prerequisite for the issuance of a preliminary injunction**." *Earthweb, Inc. v. Schlack*, 71 F.Supp.2d 299, 308 (S.D.N.Y. 1999). (Emphasis added).

Even PAI has not alleged that Ferreira has *actually* misappropriated trade secrets, has *actually* solicited customers or merchants, or has *actually* disclosed any confidential information. Instead, PAI attempts to circumvent the "single most important prerequisite" of a preliminary injunction by incorrectly arguing that Ferreira's non-compete found in his Employment Agreement is governed by the standard for enforceability of contracts entered into by a seller as a result of the sale of a business. PAI is wrong.

### II.    THE NON-COMPETE PROVISION AT ISSUE IN THIS CASE IS FOUND IN AN EMPLOYMENT CONTRACT AND NOT A CONTRACT FOR THE SALE OF A BUSINESS AND IS THEREFORE GOVERNED BY MORE STRINGENT STANDARDS.

4

### A.    PAI IS ENFORCING AN __EMPLOYMENT__ CONTRACT.

PAI seeks to enforce an employment contract entered into by Ferreira and his former employer, EDR.  When PAI and EDR completed their merger and management buy out, employees, such as Ferreira, merely continued their employment status with EDR whose name was changed to PAI following the merger.

Ferreira had no role to play in the merger negotiations, was not on the Board of Directors of EDR, was not consulted about the merger and was treated, for all intents and purposes, as an employee of EDR.  In fact, until the merger was consummated, he was only an employee.  PAI is not seeking to enforce the Merger Agreement made between the management of EDR and PAI. Notably, Paragraph 7.7 of the __Merger Agreement__ contains a non-compete for the persons who really were selling their shares in EDR in connection with the sale of the business to PAI[1]. Employees, like Ferreira, who merely continued their employment relationship, did not sign a non-compete in connection with the sale of a business, but rather **in connection with their** __**continued**__ **employment with PAI following the merger.**

### B.    NEW YORK COURTS DISTINGUISH BETWEEN EMPLOYMENT AGREEMENTS AND NON-COMPETE AGREEMENTS MADE BY THE SELLER OF A BUSINESS.

There is an obvious distinction between enforcing a non-compete in an employment contract, and a non-compete entered into by the seller of a business in favor of the purchaser.  In the latter scenario, courts protect the goodwill which the purchaser purchased.  For this reason, and this reason alone, they evaluate non-competes more leniently.  *Reed Roberts v. Strauman*, 353 NE2d 590, 593 (Ct. App. 1976).  Ferreira has no goodwill to take with him to Cynergy and even if he did, his agreement not to solicit PAI's customers, agents and employees is sufficient to protect PAI.

---

[1] Curiously, PAI only attached redacted portions of the Merger Agreement to its papers.  Now it is clear why.

This is a case where the defendant was an **employee** of the business sold/merged and, after the sale, **continued** his employment status with the newly formed business. *FTI Consulting, Inc. v. Graves*, 2007 WL 2192200, \*1 (S.D.N.Y. Jul 31, 2007)(Buchwald) is directly on point. In *FTI*, the plaintiff employer, like PAI, asked the court to treat the defendant employee's non-compete agreement (located in his Employment Agreement) by the standards governing the "sale of a business." *Id.* at \*4. The plaintiff, like PAI here, argued that the defendant's employment agreement arose out of the sale of defendant's former employer to the plaintiff and was therefore ancillary to the "sale of a business." *Id.* The plaintiff, like PAI here, argued that its purchase of the defendant's employer was contingent on securing its executive talent pool. *Id.* at \*1. The plaintiff, like PAI here, also argued that the defendant received significant compensation for selling his "interest" in his former employer upon the sale, and that the compensation came from the plaintiff as purchaser. *Id.* at \*5. The compensation to defendant, like PAI's contention in this case, was offered only to a handful of executives. *Id.*

**The court disagreed and rejected plaintiff's argument that the employment agreement arose out of the "sale of a business."** *Id.* The court reasoned that the payment to defendant for his interest in the business was part of a compensation package intended to secure defendant's employment and talent, among 28 other high-level executives, with the newly formed company. *Id.* The court further reasoned that the source and manner of the payment for his interest in the company "does not transform the transaction" from an employment agreement with an employer to a non-compete ancillary to the sale of a business. *Id.* The court placed special emphasis on the fact that the defendant, like Ferreira, "was an ordinary employee of the [sold business] and "was not a party to the Asset Purchase Agreement." *Id.* As a result, the court viewed "the Employment Agreement as a transaction separate and distinct from the Asset Purchase Agreement signed by the [seller of the business] and [the plaintiff]." *Id.* It placed additional emphasis on the fact that the Asset Purchase Agreement, like the Merger Agreement

6

here, contained its own non-compete provision applicable to the seller. *Id.* As a result, the court held "the covenants at bar, though arising out of a sales contract, pertain to employment between the parties and, therefore, must meet the criteria applicable to employment contracts." *Id.* The Court granted summary judgment to the employees and dismissed the entire case.

New York courts and others have always drawn a sharp distinction between noncompetition agreements made in conjunction with the sale of a business and those made ancillary to an employment agreement. The courts reason that the sharp distinction is warranted because, in the "sale of a business" context, the parties are generally on a more equal footing in negotiating the agreement. Moreover, the seller is generally in a better financial position to weather the effect of any restrictions on his ability to earn a living. The following cases illustrate this distinction.

o *FTI Consulting v. Graves, supra* at *4 (New York courts have recognized restrictive covenants in three types of contracts: (1) contracts for the sale of a business; (2) ordinary commercial contracts; and (3) employment contracts. A restrictive covenant in a contract for the sale of a business limits the seller's right to launch a new enterprise, which competes with the business sold. By contrast, restrictive covenants in employment contracts are "subject to more exacting scrutiny than are those in contracts for the sale of business," since public policy militates in favor of economic competition, individual liberty, and protection of employees from employers' superior bargaining position.") (citations omitted).

o *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597 (9th Cir. 1997) (noting a distinction because "the seller of a business is more likely to have equal bargaining power in negotiating such [restrictive] covenants, and is presumably compensated by an increase in the selling price, while an employee merely receives the opportunity for continued employment.").

o *Diepholz v. Rutledge*, 659 N.E.2d 989, 991 (Ill. App. 1995) (noting "[r]estrictive covenants accompanying the purchase of assets are more favorably viewed than those connected with employer-employee arrangements because of the arms length bargaining position of the parties").

o *Arch Personal Care Products, L.P. v. Malmstrom*, 90 Fed. Appx. 17, 2003 WL 23019200 (3rd Cir. 2003) (noting that "courts afford more deference to restrictive covenants ancillary to the sale of a business because the participants in the sale of a business have more equal bargaining power.")

o *Wordwave, Inc. v. Owens*, 19 Mass. L. Rptr. 37, 2004 3250472 (Mass. Super. 2004) (noting "[c]ourts look "less critically" at restrictive covenants arising from the sale of a business because, unlike employers and employees, buyers and sellers are likely to be similarly-situated, with equal bargaining power and often times the benefit of counsel.")

7

o  *Dicen v. New Sesco, Inc.*, 806 N.E.2d 833 (Ind. App. 2004) ("Covenants not to compete are typically found in both employment contracts and contracts for the sale of a business, and the two differ in how they are treated by the courts. Covenants not to compete found in employment contracts are ill-favored at law, whereas non-competition covenants ancillary to the sale of a business are not as disfavored....In a sale of a business there is more likely to be equal bargaining power between the parties; the proceeds of the sale generally enable the seller to support himself temporarily without the immediate need to enter into competition with his former business; and a seller is usually paid a premium for agreeing not to compete with his former business...[o]n the other hand, an ordinary employee typically has only his own labor skills to sell and often is not in position to bargain with his employer.")

o  *Guardian Fiberglass, Inc. v. Whit Davis Lumber Co.*, 2006 WL 796946 (E.D. Ark. 2006) (noting the differences between the employer-employee contract and the sale of a business, the court reasoned that the sale of a business "typically involves a transaction in which the parties have negotiated for and established a price which includes the transfer of the seller's goodwill...the terms of the covenants are a material part of the agreement itself, typically arrived at following an arms-length negotiation process.")

o  *Western Insulation, L.P. v. Moore*, 2006 WL 208590 (E.D. Va. 2006) ("The Court is obligated to note, however, **the vast difference** between restrictive covenants in employment agreements and restrictive covenants in the context of a sale of a business, particularly where sophisticated parties are involved...[t]he standards are different, in part, because employees have comparatively little bargaining power and less leverage for negotiating a fair deal. In contrast, when a business is sold, the transaction typically involves sophisticated parties coming to an agreement after an arms-length negotiation process.")

o  *Arcor, Inc. v. Haas*, 842 N.E.2d 265 (Ill.App.3d 2005) ("[E]mployment contracts and covenants ancillary to the sale of a business are analyzed under different standards...a purchaser in the sale of a business context holds more bargaining power than an ordinary employee in an employment context.")

o  *Target Rental Towel v. Byrd*, 341 So.2d 600, 604 (La App 1977) (holding that an employee's mere ownership of stock in a business is not enough to evaluate the employee's restrictive covenant under the 'sale of business' standard as "the right to control is one of the most important tests in determining whether one is truly an employee" or an owner of a business.).

o  *S.Hammond Story Agency, Inc. v. Baer*, 414 S.E.2d 287 (Ga. App. 1991) (holding that a restrictive covenant would not be viewed under the "sale of business" standard notwithstanding the fact that employee was a 'minority shareholder' and had profited from the sale of the business to plaintiff. The court reasoned the defendant, notwithstanding his stock options, had no control over the business and, as such, was a "mere employee" for purposes of evaluating his restrictive covenants.).

o  *Hartmann v. W.H. Odell & Assoc., Inc.*, 450 S.E.2d 912 (NC App 1994) (rejecting "the defendant's argument that [the employee's] covenant involves the sale of a business rather than employer-employee relationship" notwithstanding "a buy-sell agreement require[ing] [the employee] to resell his shares of stock to his employer" at a profit as "it is clear that this covenant not to compete was executed ancillary to an employment agreement".)

8

o *Redmond v. Royal Ford, Inc.*, 244 Ga. 711, 261 S.E.2d. 585 (1979) (finding an employee's <u>stock options</u> in the employer's business does not permit an employment agreement to be evaluated under the "sale of business" standard as an employee's stock options are not made in conjunction with the sale of a business).

Plaintiff's reliance on *Misys Int'l Banking Systems, Inc. v. Two Four Systems*, 800 N.Y.S.2d 350 (table), 2004 WL 3058144 (Sup. Ct. N.Y. Cnty., Commercial Div., Nov. 23, 2004) is entirely misplaced. There, the court preliminary enjoined the *two sellers* of a company from *soliciting clients* of Misys, which purchased the *seller defendants' company*. The Court did <u>not</u> enforce the covenant prohibiting defendants from being in a competing business, which is what PAI seeks here. Ferreira has already agreed not to assist Cynergy in soliciting PAI's merchant customers as this is not to be part of his job duties at Cynergy.

The *Misys* court found the sellers were ***actively*** soliciting customers of their former business that Misys had purchased and, as a result, granted Misys's request for a preliminary injunction. Notably, the court placed special emphasis on the fact that Misys, unlike PAI, was required to pay the defendant employee's salary for the duration of the injunction pursuant to their agreement, prohibiting solicitation.

Unlike *Misys*, where the seller defendants were ***actively*** soliciting customers in violation of their implied covenant, Plaintiff has not shown any solicitation of former customers by Ferreira and has not shown any actual misappropriation of trade secrets or confidential information.

Because this case does not involve a sale of business covenant, PAI <u>must</u> show a likelihood of irreparable harm before this Court can issue a preliminary injunction against Ferreira throwing him out of a job for two years without any means of supporting himself.

9

## IV.    THE "INEVITABLE DISCLOSURE" DOCTRINE DOES NOT APPLY

### A.    THE DOCTRINE HAS LIMITED APPLICATION AND IS USED <u>RARELY</u> BY THE COURTS.

New York Courts have not adopted the "inevitable disclosure" doctrine. *See Marietta Corp v. Fairhurst*, 301 A.D.2d 735, 736 (N.Y. 3d 2003) (reversing the lower court's use of the doctrine). The doctrine "is disfavored in New York as a basis for an irreparable harm finding…." *Boston Laser v. Qinxin Zu*, 2007 WL 2973663, *9, fn 12 (N.D.N.Y. Sept. 21, 2007). Regardless, when used by the federal courts, the doctrine only applies in those limited circumstances "where the movant competes directly with the new employer **and the transient employee <u>possesses highly confidential or technical knowledge</u> concerning manufacturing process, marketing strategies, or the like.**" *Earthweb v. Schlack*, 71 F.Supp.2d 299 (S.D.N.Y. 1999). "Absent evidence of <u>actual misappropriation</u> by an employee, the doctrine should be applied only in the **<u>rarest</u>** of cases." *Id.* at 310.

As a result, the doctrine is limited to those employees holding either (1) highly technical expertise in high tech industries, or (2) where the present and former employers were "endeavoring to develop the <u>identical</u> product and the breaching employee had "learned exactly [how the former employer] was making the [product]," including all details concerning the production process." *International Paper Company v. Suwyn*, 966 F.Supp. 246, 258 (S.D.N.Y. 1997).

The inevitable disclosure doctrine does not apply to the facts of this case where it is undisputed that Ferreira's involvement with the COLT system was limited to providing oversight and basic direction rather than programming and intricate involvement with software architecture. The following cases make this conclusion black-letter law:

   o  In *Business Intelligence Services, Inc. v. Hudson*, 580 F.Supp. 1068 (S.D.N.Y. 1984), the doctrine was applied where the former employee held intricate knowledge of her former employer's software, including knowledge of source codes, which would allowed her to develop or improve the competing software product "with little or no effort".

o  "Mere knowledge of the intricacies of a business is simply not enough." *Boston Laser, supra* at \*9; *Marietta Corp. v. Fairhurst, supra* at 739; *see also Abraham Zion Corp. v. Lebow*, 593 F.Supp. 551, 556 (S.D.N.Y. 1984).

o  An employee providing only "conceptual goals" does not acquire information protected by trade secret and a "contrary holding, the New York Court of Appeals has emphasized, would make those in charge of operations or specialists in certain aspects of an enterprise **virtual hostages of their employers**." *International Paper*, 966 F.Supp. at 257 (quoting *Reed, Roberts Assoc., Inc. v. Strauman*, 40 N.Y.S.2d 303, 343 N.E.2d 590 (N.Y. 1976).

o  The courts distinguish between an employee who is the "architect" (Dawn Murray) of software or hardware and the general managerial employee (Ferreira) providing only general oversight or conceptual goals. *Id.*

o  In *Inflight Newspapers, Inc. v. Magazines In-Flight, LLC*, 990 F.Supp. 119, 130 (E.D.N.Y. 1997) the court drew a distinction between an employee pursuing "a general conceptual goal by incorporating specific needs and wants in the form of instructions for a programmer" and the nuts and bolts of actually designing the software and hardware architecture.

o  *Pella v Buscarnera*, 2007 WL 2089298 (ED NY. 2007) (because employee could not replicate computer system, no risk of disclosure of a trade secret.

o  *PSC v Reiss*, 111 FSupp 2d 252 (WD NY 2000) (because no access to software development, but only surface design, no trade secret).

o  In *Silipos, Inc. v. Bickel*, 2006 WL 2265055 (S.D.N.Y. Aug. 8, 2006), the court found the former employee's lack of technical knowledge about the chemicals used in former employer's gel formulations prevented him from meaningfully informing others on how to duplicate it.

o  Plaintiff's reliance on *Estee Lauder Companies, Inc. v. Batra*, 430 F.Supp.2d 158 (S.D.N.Y. 2006) is misplaced. In fact, it actually supports the limited application of the doctrine as defined in *Earthweb* and *International Paper*. In *Batra*, the employee, a global senior executive, was in charge of two of the employer's major cosmetic brands sold worldwide. He was "*responsible* for product development and for guiding new product entries into different market segments...and to keep abreast of the **technologies and key ingredients** for the products developers were asked to create." *Id.* at 161. Moreover, the employee had direct knowledge of the key ingredients and marketing strategy for "twelve new products that are presently in the pipeline." *Id.* at 164. The court found that the employee's new employer was a direct competitor in the fiercely competitive cosmetics industry. The court reasoned that the employee's knowledge of the key ingredients and the strategic marketing of his former employer's new products would inevitably be disclosed to his new employer marketing the same product for sale.

Ferreira's generalized level of input into COLT did not permit him access to the type of information traditionally afforded trade secret protection, much less triggering the inevitable

11

disclosure doctrine. Notably, PAI does not dispute that Dawn Murray was the "architect" of the COLT software system.

PAI has failed to articulate, with any degree of specificity, the other, alleged confidential, proprietary or trade secret information to which Ferreira purportedly was exposed during his employment, other than in purely conclusory terms. Such information cannot, therefore, be the basis of injunctive relief, *Boston Laser, Inc. v. Zu*, 2007 WL 2973663 (ND NY 2007) (inevitable disclosure doctrine disfavored; failure to articulate with any degree of specificity the trade secret information other "than in purely conclusory terms" fatal); *Catalogue Service v. Henry*, 484 NYS2d 615 (2d Dept. 1985) (knowledge of intricacies of business operations not a trade secret). Notably, despite the fact that confidential and proprietary information is allegedly at stake in the action, and particulars regarding the COLT software system have been the subject of extensive submissions by PAI, no protective order has been issued in this case pursuant to FRCP Rule 26(c), nor has PAI either requested one or taken other measures to preserve the integrity of its allegedly confidential information disgorged in support of its motion. *See Boston Laser, supra* at 12.

PAI's reliance on *Global Telesystems, Inc. v. KPNQWEST*, 151 F.Supp.2d 478 (S.D.N.Y. 2001), for the proposition that the inevitable disclosure doctrine applies to employees lacking technical or highly confidential information, is also misplaced. In *Global*, the plaintiff sought a preliminary injunction against the defendant from soliciting and hiring plaintiff's telecommunications employees. Both plaintiff and defendant competed in the fiercely competitive IP network of fiber optic telecommunications. Pursuant to an agreement, Global obtained a segment of KPNQ's telecommunications business and, in turn, KPNQ agreed not to solicit any employees who were acquired through Global's acquisition. In violation of the agreement, KPNQ began soliciting and hiring its former employees acquired by Global. The court concluded that KPNQ's *active* solicitation of Global's telecommunications employees

12

warranted the issuance of a preliminary injunction to enforce the non-solicitation and no-hire

provision as "New York recognizes the enforceability of covenants not to solicit employees."

## V.    THE RESTRICTIVE COVENANT IN FERREIRA'S EMPLOYMENT AGREEMENT IS UNENFORCEABLE AS IT IS UNREASONABLE IN DURATION AND BECAUSE IT FAILS TO PAY FERREIRA HIS SALARY DURING THE TWO-YEAR DURATION.

The restrictive covenant in the Employment Agreement contains a two-year restriction on

Ferreira's ability to work in the electronic payment processing industry, the only industry in

which he has any real work experience.    The Employment Agreement contains no

requirement that PAI pay Ferreira during the time he is unable to work.    These restrictions

are overbroad and, on this basis alone, the restrictive covenant should be rendered

unenforceable.

In evaluating the reasonableness of a restrictive covenant and the balance of harms,, the

courts will always look to whether "an employee receives continued consideration for his loyalty

and good will."    Payment of salary is a necessary prerequisite to satisfy the balance of harms test

as reflected in the following cases:

o   *Bradford v. New York Times Co.*, 501 F.2d 51, 58 (2nd Cir. 1974) (noting that "this factor cannot be overlooked in determining the reasonableness of the restraint presented");

o   *Maltby v. Harlow Meyer Savage, Inc.*, 166 Misc. 2d 481, 486, 633 N.Y.S.2d 926 (N.Y. Sup.Ct. 1995) (holding six-month duration not to complete reasonable only because employee continued to receive his salary from the plaintiff during the six-month duration which mitigated against infringing on employee's livelihood);

o   *Estee Lauder Companies, Inc. v. Batra*, 430 F.Supp.2d 158 (S.D.N.Y. 2006) (relied upon by PAI) (finding that plaintiff's agreement to pay defendant his salary for the entire duration of the covenant rendered the twelve month period and lack of geographic scope reasonable as the defendant could continue to maintain his livelihood).

o   *Lumex v. Highsmith*, 919 F.Supp. 624 (E.D.N.Y. 1996) (relied upon by PAI) (finding six month duration reasonable because defendant would be fully compensated by the plaintiff during the six month duration including health and life insurance premiums).

Here, the Employment Agreement contains no such provision which is fatal to enforcement.

13

In the event this Court determines the restrictive covenant to be enforceable to some extent, notwithstanding its unreasonable duration, lack of geographic limitation, and failure to continue payment of Ferreira's salary during the two year duration, the Court should "blue-pencil" the covenant's two-year duration in light of the uncontested fact that the electronic payment processing industry is a dynamic and high tech industry. *See* Verified Complaint, ¶ 15 ("The market for EPP services is growing rapidly with the proliferation of credit, debit and gift cards, ATMs, and the improvement of hardware and software applications."). The following cases illustrate the inclination of the courts to "blue pencil" a restriction in order to protect the defendant employee's livelihood:

o  *Estee Lauder v Batra, supra,* (reducing 12 month non-compete to five months).

o  *Double Click, Inc. v. Henderson,* No. 116914/97, 1997 WL 731413, *8 (N.Y. Sup. Co., N.Y. Cty., Nov. 7, 1997) (reducing one year duration to six months in high tech industry).

o  *Earthweb, Inc. v. Schlack,* 71 F Supp. 2d 299, 313 (S.D.N.Y. 1999) (finding restrictive covenant unenforceable as one-year duration is unreasonable in a high tech industry and, in turn, refusing to "blue pencil" a new duration).

o  *Silipos, Inc. v. Bickel,* No. 1:06-cv-02205, 2006 WL 2265055, *1 (S.D.N.Y. Aug. 8, 2006)(Casey) (refusing to enforce non-competition covenant and instead limiting enforcement to just the non-solicitation covenant prohibiting defendant employee from soliciting customers of plaintiff).

o  *AM Medica Communications Group v. Kilgallen,* 261 F.Supp.2d. 258 (S.D.N.Y. 2003) (refusing to blue pencil restrictive covenant containing two year duration as it is unreasonable and therefore unenforceable as a whole).

o  *Coyne Intern. Enterprises Corp. v. Taylor,* 2004 WL 1803271 (E.D. Pa. 2004) (finding two-year duration unreasonable where covenant contained no geographic limitation and effectively prohibited defendant employee "from working in the only industry in which he has real work experience.").

## VI.  PAI IS REQUIRED TO POST A BOND IN THE EVENT THE COURT ISSUES AN INJUNCTION.

Under Rule 65(c) of the Federal Rules of Civil Procedure, "No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper." If an injunction is issued, PAI is required to post a bond of at

14

least $750,000, which is the equivalent of two years of Ferreira's salary with Cynergy along with benefits, in the event the injunction was improper.

A bond is normally required when an injunction is issued as reflected in the following cases.

- o   *Catalogue Service of Westchester, Inc. v. Henry*, 107 A.D.2d 783 (N.Y.A.D.2 Dept. 1985) (reversing lower court for failing to require the posting of a bond).

- o   *Continental Group, Inc. v. Kinsley*, 422 F.Supp. 838, 846 (D.Conn. 1976) (requiring bond in the amount equivalent to 18 months of defendant's salary).

- o   *Lumex, Inc. v. Highsmith*, 919 F.Supp. 624, 636 (E.D.N.Y. 1996) (requiring bond in the amount of $100,000 notwithstanding the fact that the plaintiff was required to pay the defendant employee's salary during the preliminary injunction).

- o   *Misys Intern. Banking Systems, Inc., supra*, at *11 (requiring bond in the amount of $750,000).

- o   *Inflight Newspapers, Inc v Magazines In-Flight, LLC*, 990 F.Supp 119, 140 (E.D.N.Y. 1997) (requiring $250,000 bond).

- o   *Alpha Capital Aktiengesellschaft v Advanced Viral Research Corp.*, 2003 WL 328302, *6 (S.D.N.Y. Feb. 11, 2003) (requiring $100,000 bond).

## CONCLUSION

For the reasons set forth above, Defendant Ferreira respectfully requests the Court to deny the Plaintiff's request for a preliminary injunction and grant any further relief the Court deems justified.

Respectfully submitted,

/s/ Peter M. Falkenstein
Peter M. Falkenstein (Michigan P61375)
Eric A. Linden (Michigan P33249)
Jonathan C. Myers (Michigan P69972)
JAFFE RAITT HEUER & WEISS, P.C.
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
248.351.3000
pfalkenstein@jaffelaw.com
elinden@jaffelaw.com
Dated: October 26, 2007    jmyers@jaffelaw.com

1456952.01