UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Index No.: 07 CIV 8685 (BSJ)

PAYMENT ALLIANCE INTERNATIONAL, INC.,

        Plaintiff,

- against –

MANUEL FERREIRA,

        Defendant.

## AFFIDAVIT OF MANUEL FERREIRA

I, Manuel Ferreira, being first duly sworn, depose and say that I have personal knowledge of the matters set forth herein and, if sworn as a witness, I would be competent to testify as follows:

1.    I make this Affidavit in order to respond to some of the contentions made by Dawn Murray and Gregory Sahrmann in the Declarations they submitted in PAI's reply brief, as well as to point out certain other matters relevant to the court's decision in this matter.

2.    Dawn Murray's Declaration and mine are not that inconsistent regarding my involvement with development of the COLT software system. She was in fact the architect of the system and she did report directly to me in my capacity as Senior Vice President of Operations. I also did provide limited suggestions on functional items that should be included in the COLT software system. I think it clear from both my previous Affidavits and Dawn Murray's Declaration that I am incapable of sharing any programming information with Cynergy or otherwise duplicating any of the programs or functions which the COLT software system

performs. My involvement was not at the technical or source code level and therefore I am not able to "steal" or otherwise misappropriate PAI's technology even if I wanted to or Cynergy asked me to.

3. Sahrmann's Declaration, particularly Paragraph 6 concerning the EDR-PAI transaction, is demonstrably false. Attached as Exhibit A is a listing provided to me by Jenkins & Gilchrist, counsel to EDR in the transaction, providing a list of persons who received distributions in the EDR-PAI merger. I was hardly one of the top four shareholders who received compensation, as Sahrmann alleges. In fact, Exhibit A makes clear that the EDR-PAI transaction was a management buyout, not an outright sale of the company.

4. In essence, top management, along with new equity investors, purchased the interest of what Exhibit A labels the Investors. The company was not "sold" in the traditional sense, but rather merged into a subsidiary created by the new investors.

5. Employees, such as myself, merely continued their employment status with EDR whose name was simply changed to PAI following the merger. I had no role to play in the merger negotiations, was not on the Board of Directors of EDR, was not consulted about the merger or its financial terms and was treated, for all intents and purposes, as an employee of EDR, not an owner.

6. I was also not a shareholder of EDR until the merger took place. Rather, as part of my compensation, I was given stock options to acquire shares of EDR. Only when the merger was consummated did those stock options automatically convert into shares of the company. As part of the merger, 75% of my EDR shares were converted into PAI shares. The total amount of cash I received in connection with the merger was $40,069, as reflected in Exhibit A.

2

1457049 03

7. I do not have an executed version of the Merger Agreement but I do have a draft which was circulated by Jenkins & Gilchrist on September 13, 2005. A true and correct copy of what I received is attached as Exhibit B to this Affidavit.

8. I call the court's attention to Paragraph 7.7 of this draft. That section contains a non-compete for Management Selling Shareholders which is defined to be those members of management who signed the Merger Agreement. To the best of my recollection, I was never asked to sign the Merger Agreement and did not do so. Employees, like myself, who merely continued their employment relationship, did not sign a non-compete in connection with the sale of a business but rather in connection with their continued employment with PAI following the merger. That is why PAI seeks to enforce an Employment Agreement in this case and not the Merger Agreement. Therefore, as I have repeatedly stated, the non-compete I signed was in my capacity as an employee of PAI and not as a selling shareholder of EDR.

9. I also disagree with Sahrmann's description of the COLT software system. To the best of my recollection, the COLT software system does not convert manually submitted information into electronic information. Rather, the conversion is done by human beings who input the information manually into COLT. VIMAS handles these matters in the exact same way and thus there is no software efficiencies of COLT over VIMAS. In my opinion, an automated system such as COLT and VIMAS is not only not unusual, but is necessary to compete in the marketplace today. And, VIMAS does get merchants boarded and processing at the top of every hour for those merchants whose information is submitted electronically which is, as pointed out before, almost 90% of Cynergy's merchants.

10. The rest of Sahrmann's discussion regarding the purported advantages of COLT over VIMAS are simply conclusory statements without any factual support so I am unable to respond to them.

11. Sahrmann also suggests that PAI has a proprietary point of sale terminal that constitutes a trade secret. A proprietary terminal in this industry is nothing new. In fact, Cynergy is already working with a German company to create its own proprietary terminal. The company Sahrmann identifies in his Declaration as creating the proprietary terminal for PAI also works for other PAI competitors in the industry.

12. Cynergy, like PAI, has an in-house sales force and independent sales organizations selling Cynergy's services. Cynergy is far larger than PAI and already has in place form agreements and a salary and pay structure which it has used for years. There is nothing about PAI's relationships with its sales teams that constitutes a trade secret. Moreover, Cynergy's pricing is, logically, dependent upon its relationship with its business partners who are different than those used by PAI, and so information concerning PAI's pricing would be irrelevant to Cynergy.

13. Moreover, I have already agreed that I would not assist Cynergy in soliciting PAI's merchants or sales force. Therefore, any information concerning PAI's relationships with these persons will not be of use to or used by Cynergy.

14. Finally, Paragraph 29 of the Sahrmann Declaration provides a bunch of adjectives but without any facts supporting them concerning purported other "trade secrets" I know. Again, it is impossible to respond to assertions made without any detailed facts supporting them.

15. I do note, however, that my previous testimony concerning what I was told when I signed the non-compete by Bill Blakey has never been refuted or contested by PAI, including the

4

misrepresentation that the non-compete would never be used to prevent me from working in the only industry which I have ever known.

Further Affiant sayeth not.

I declare under penalty of perjury the foregoing is true and correct to the best of my knowledge, information and belief.

DATE: 10/25/07

_____
Manuel Ferreira