# EXHIBIT B

K&E DRAFT
SEPTEMBER 8, 2005

AGREEMENT AND PLAN OF MERGER

by and between

ELECTRONIC DATA RESOURCES, INC.,

[PAYMENT ALLIANCE HOLDINGS, LLC]

and

[NEWCO]

dated as of

September 20, 2005

TABLE OF CONTENTS

Article I Definitions .................................................................................................2
Article II Merger ......................................................................................................8
    2.1    Merger ..........................................................................................8
    2.2    Payment of Closing Cash Purchase Price ...................................9
    2.3    Conversion of Shares ..................................................................9
    2.4    Stock Transfer Books ................................................................11
    2.5    Time and Place of Closing .........................................................11
Article III Representations and Warranties Concerning Company ........................11
    3.1    Organization, Standing and Power ............................................11
    3.2    Subsidiaries; Equity Interests ...................................................12
    3.3    Capital Structure .......................................................................12
    3.4    Authority; Execution and Delivery; Enforceability ..................13
    3.5    No Conflicts; Consents ..............................................................13
    3.6    Financial Statements; Undisclosed Liabilities ..........................14
    3.7    Absence of Certain Changes or Events ......................................14
    3.8    Taxes .........................................................................................16
    3.9    Employee Benefit Plans .............................................................17
    3.10    Labor and Employment Matters ...............................................19
    3.11    Litigation ...................................................................................20
    3.12    Compliance with Applicable Laws ............................................21
    3.13    Environmental Matters ...............................................................21
    3.14    Contracts ....................................................................................22
    3.15    Certain Business Practices ..........................................................24
    3.16    Personal and Real Property ........................................................25
    3.17    Intellectual Property ...................................................................26
    3.18    Insurance ....................................................................................27
    3.19    Compensation ............................................................................28
    3.20    Affiliated Transactions ..............................................................28
    3.21    Books and Records ....................................................................29
    3.22    Brokers, Finders and Advisors ..................................................29
    3.23    Title to Assets ............................................................................29
    3.24    Powers of Attorney ....................................................................29
    3.25    Guaranties .................................................................................29
    3.26    Chargebacks ..............................................................................29
    3.27    Product Liability ........................................................................30
    3.28    Business Continuity ...................................................................30
    3.29    Customers and Suppliers ...........................................................30
    3.30    Credit Association Rules ............................................................30
    3.31    Disclosure .................................................................................30
Article IV Parent and Newco Representations and Warranties ..............................31
    4.1    Organization; Approvals ...........................................................31
    4.2    Authority; Execution and Delivery; Enforceability ..................31
    4.3    No Conflicts; Consents ..............................................................31
    4.4    Litigation ...................................................................................32
    4.5    Brokers, Finders and Advisors ..................................................32

4.6     Investment Representations .......................................................................... 32
4.7     Newco ............................................................................................................ 33
4.8     No Knowledge of Misrepresentations or Omissions .................................. 33
4.9     No Other Representations ............................................................................. 33
Article V Additional Agreements ................................................................................. 33
5.1     Public Announcements .................................................................................. 33
5.2     Tax Matters .................................................................................................... 33
5.3     Indemnification for Taxes ............................................................................ 35
5.4     Employment of Employees ........................................................................... 36
Article VI Conditions of Closing ................................................................................. 36
6.1     Conditions to Obligations of Each Party .................................................... 36
6.2     Additional Conditions to Obligations of the Parent and Newco ............... 37
6.3     Additional Conditions to Obligations of the Company. .............................. 39
Article VII Post Closing Covenants ............................................................................. 40
7.1     Records; Cooperation ................................................................................... 40
7.2     Employee Benefit Matters ............................................................................ 40
7.3     Further Assurances ....................................................................................... 40
7.4     Litigation Support ......................................................................................... 41
7.5     Customer Relations, Etc. .............................................................................. 41
7.6     Confidential Information ............................................................................... 41
7.7     Non-Compete ................................................................................................ 42
Article VIII Survival of Agreements; Indemnification ............................................... 42
8.1     Survival of Representations and Warranties ............................................... 42
8.2     Indemnification of Company Indemnified Parties ....................................... 42
8.3     Indemnification of Parent Indemnified Parties ........................................... 43
8.4     Third Party Claims ....................................................................................... 43
8.5     Limitations on Indemnification .................................................................... 44
8.6     Calculation of Amounts; Other Limitations ................................................ 45
8.7     Exclusive Remedy ......................................................................................... 45
Article IX Miscellaneous .............................................................................................. 47
9.1     Notices ........................................................................................................... 47
9.2     Headings; Internal References ..................................................................... 48
9.3     Severability ................................................................................................... 48
9.4     Interpretation ................................................................................................ 48
9.5     Entire Agreement .......................................................................................... 48
9.6     Assignment .................................................................................................... 48
9.7     Governing Law .............................................................................................. 48
9.8     Counterparts ................................................................................................. 48
9.9     Fees and Expenses ........................................................................................ 49
9.10    Amendment .................................................................................................... 49
9.11    Consent to Jurisdiction ................................................................................. 49
9.12    Waiver of Jury Trial ...................................................................................... 50
9.13    Stockholders' Representative ....................................................................... 50

Exhibits
    Exhibit A  Escrow Agreement
    Exhibit B  Jenkins and Gilchrist Opinion .................................................. A-1
    Exhibit C  Kirkland & Ellis Opinion .................................................. B-1

## AGREEMENT AND PLAN OF MERGER

This Agreement and Plan of Merger (this "**Agreement**"), is made and entered into effective as of the 20th day of September, 2005, by and among Electronic Data Resources, Inc., a Delaware corporation (the "**Company**"), [Payment Alliance Sub], a Delaware corporation (the "**Newco**"), Payment Alliance Holdings, LLC, a Delaware limited liability company (the "**Parent**"), and, solely for purposes of Sections 7.3, 7.4, and 7.6, certain of the indemnification provisions contained in Article VIII, and Sections 9.10 and 9.11, the holders of the capital stock of the Company listed on the signature pages of this Agreement (the "**Principal Stockholders**"), the Management Selling Stockholders (as defined below) and each other Stockholder executing a signature page hereto.

### RECITALS

WHEREAS, upon the terms and subject to the conditions of this Agreement and in accordance with the General Corporation Law of the State of Delaware (the "DGCL"), the Parent and the Company will enter into a business combination transaction pursuant to which Newco will merge with and into the Company with the Company surviving (the "**Merger**");

WHEREAS, the Board of Directors of the Company has (a) determined that the Merger is in the best interests of the Company and the holders of the Company's (i) common stock, par value $0.01 per share (the "**Common Stock**"), (ii) Series A preferred stock, par value $0.01 per share (the "**Series A Preferred Stock**"), (iii) Series B preferred stock, par value $0.01 per share (the "**Series B Preferred Stock**"), and (iv) Series C preferred stock, par value $.01 per share (the "**Series C Preferred Stock**," and collectively with the Series A Preferred Stock and the Series B Preferred Stock, the "**Preferred Stock**"), and has approved and adopted this Agreement and declared its advisability and approved the Merger and the other transactions contemplated hereby and (b) the Stockholders have approved and adopted this Agreement and the Merger by unanimous written consent;

WHEREAS, the Board of Directors of Newco (a) has determined that the Merger is in the best interests of Newco and the Parent (its sole stockholder) and has approved and adopted this Agreement, the Merger and the other transactions contemplated hereby and (b) the Parent has approved and adopted this Agreement and the Merger; and

WHEREAS, the Parent, in its capacity as sole stockholder of Newco, has approved and adopted this Agreement and the Merger by unanimous written consent in accordance with the requirements of the DGCL.

### AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing premises and the representations, warranties and agreements contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions set forth in this Agreement, the Parties agree as follows:

# ARTICLE I
## DEFINITIONS

As used in this Agreement and the exhibits, schedules and documents delivered pursuant to this Agreement, the following terms shall have the following meanings:

"**Affiliate**" of a Person (as defined herein) means any Person that directly or indirectly controls, is controlled by or is under common control with such Person. For the purpose of this definition, "control" of a Person means the power to direct, or to cause the direction of, the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms and phrases "controlling," "controlled by" and "under common control with" have correlative meanings.

"**Agreement**" means this Agreement and Plan of Merger, as amended, modified or supplemented from time to time, together with all exhibits, the Disclosure Schedule and other schedules hereto.

"**Business Day**" means any day on which national banks located in Dallas, Texas are generally open to the conduct of banking business and excluding Saturdays and Sundays.

"**Bylaws**" has the meaning given in Section 2.1(c)(ii).

"**Card Associations**" means MasterCard International, Inc., VISA U.S.A., Inc., VISA International, Inc., Discover, JCB, American Express, Diners Club, Voyager, Carte Blanche and any other card association, debit card network or similar entity with whom the Company may directly or indirectly have a sponsorship agreement.

"**Chargebacks**" means a charge on a credit card or debit card that is unpaid by the financial or other institution that issued such card and a charge as otherwise defined in the rules, regulations or bylaws of the applicable Card Association and which have historically been reflected on the applicable processing bank's statement as losses and/or rejected fees, including ACH rejects and merchant reimbursements.

"**Certificate**" has the meaning given in Section 2.3(b).

"**Certificate of Incorporation**" has the meaning given in Section 2.1(c)(i).

"**Certificate of Merger**" has the meaning given in Section 2.1(b).

"**Closing**" has the meaning given in Section 2.7.

"**Closing Certificate**" has the meaning given in Section 2.2(a).

"**Closing Date**" has the meaning given in Section 2.5.

"**COBRA**" has the meaning given in Section 7.2(b).

"**Code**" means the Internal Revenue Code of 1986, as amended, modified or supplemented from time to time, or any successor statute.

"**Common Stock**" has the meaning given in the first recital.

"**Company**" has the meaning given in the preamble of this Agreement

"**Company Bylaws**" has the meaning given in Section 3.1(c)

"**Company Certificate**" has the meaning given in Section 3.1(c)

"**Company Indemnified Part(ies)**" means the Company (prior to the Closing), the Stockholders, their Affiliates (other than the Company and its Subsidiaries subsequent to the Closing), and their Representatives.

"**Company Intellectual Property**" has the meaning given in Section 3.17(a)

"**Company Leases**" means all leases, subleases, licenses, concessions and other agreements (whether written or oral) pursuant to which the Company or any of its Subsidiaries occupies any real property as tenant, lessee, or sublessee.

"**Consent**" has the meaning given in Section 3.5(b).

"**Contract**" has the meaning given in Section 3.5(a).

"**Controlled Group Member**" means a person which is (a) a member of a controlled group of corporations, as defined in Section 414(b) of the Code, that includes the Company, (b) a member of a group of trades or businesses under common control, as defined in Section 414(c) of the Code or Section 4001(b)(i) of ERISA, that includes the Company, or (c) a member of an affiliated service group, as defined in Section 414(k) of the Code, that includes the Company

"**Damages**" means any actions, suits, proceedings (including any investigation or inquiries), costs, expenses, liabilities, obligations, and claims of any kind or nature whatsoever.

"**Deductible**" has the meaning given in Section 8.5

"**DGCL**" has the meaning given in the first recital.

"**Disclosure Schedule**" means the disclosure schedule of the Company attached hereto and incorporated into this Agreement

"**Effective Time**" has the meaning given in  has the meaning given in Section 2.1(b)

"**Encumbrances**" means any Liens, reservations of interest in title or other encumbrances.

"**Environmental Claim**" has the meaning given in Section 3.13

"**Environmental Laws**" has the meaning given in Section 3.13.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, modified or supplemented from time to time, or any successor statute.

"**Escrow Account**" has the meaning given in Section 2.2(b).

"**Escrow Agreement**" has the meaning given in Section 2.2(b).

"**Escrow Funds**" has the meaning given in Section 2.2(b).

"**Exchange Act**" means the Securities and Exchange Act of 1934, as amended, modified or supplemented from time to time, or any successor statute.

"**Executive Bonus Plan**" means the Executive Bonus Plan of the Company dated [_____].

"**Financial Statements**" has the meaning given in Section 3.6(a).

"**GAAP**" means United States generally accepted accounting principles.

"**Governmental Entity**" means federal, state, local or foreign government or any court, administrative, regulatory agency, commission, department or similar body, tribunal or other governmental authority, bureau or agency having jurisdiction.

"**Hazardous Substance**" has the meaning given in Section 3.13.

"**Improvements**" has the meaning given in Section 3.16(c).

"**Indebtedness**" means, of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (c) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (d) all guarantee obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (c) above, (e) all obligations of the kind referred to in clauses (a) through (d) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"**Indemnifying Party**" has the meaning given in Section 8.4.

"**Intellectual Property**" has the meaning given in Section 3.17(a).

"**IRS**" has the meaning given in Section 3.8(a)

"**Judgment**" has the meaning given in Section 3.5(a).

"**Knowledge of the Company**" or the "**Company's Knowledge**" means the knowledge, after reasonable investigation, of Bill Blakey and Michael Kopp.

"**Law**" means any federal, state, local or foreign statute, law, ordinance, regulation, code, rule, or Judgment of any Governmental Entity.

"**Leased Real Property**" means all leasehold or subleasehold estates and other rights to occupy any land, buildings or structures.

"**Lien**" means any mortgage, pledge, security interest, encumbrance, lien, claim or charge of any kind.

"**Management Selling Stockholders**" means all members of the management of the Company executing a signature page to this Agreement.

"**Material Contracts**" has the meaning given in Section 3.14(a).

"**Material Adverse Effect**" means a material and adverse effect on the financial condition, properties, business or results of operations of the Company and its Subsidiaries, taken as a whole, or on the ability of the Company to perform its obligations under this Agreement or to consummate the Merger.

"**Merchant**" means any merchant provider of goods or services

"**Merger**" has the meaning given in the first recital

"**Merger Consideration**" has the meaning given in Section 2.3(a)

"**Merger Shares**" has the meaning given in Section 2.3(a).

"**Most Recent Financial Statements**" has the meaning given in Section 3.6(a).

"**Newco**" has the meaning given in the preamble of this Agreement.

"**Newco Class A Common Stock**" means the Class A common stock of Newco as set forth in the certificate of incorporation of Newco as of the Effective Time.

"**Newco Class B Common Stock**" means the Class B common stock of Newco as set forth in the certificate of incorporation of Newco as of the Effective Time.

"**New Plans**" has the meaning given in Section 7.2

"**Old Plans**" has the meaning given in Section 7.2.

"**Parent**" has the meaning given in the preamble of this Agreement.

"**Parent Approvals**" has the meaning given in <u>Section 4.1</u>.

"**Parent Indemnified Party(ies)**" means the Parent (and its Affiliates and their respective Representatives), Newco (and its Affiliates and their respective Representatives) and, subsequent to the Closing, the Company (and its Affiliates and their respective Representatives).

"**Parties**" means the Company, the Parent and Newco

"**Party to be Indemnified**" has the meaning given in <u>Section 8.4</u>.

"**Permits**" has the meaning given in <u>Section 3.12(b)</u>.

"**Person**" means an individual, a partnership, a limited liability company, a joint venture, a corporation, a trust, an unincorporated organization, a division or operating group of any of the foregoing, a government or any department or agency thereof or any other entity.

"**Plan**" means (a) any employee benefit plan as defined in Section 3(3) of ERISA, (i) which is maintained by the Company, any Subsidiary or any of its Controlled Group Members, (ii) to which the Company, any Subsidiary or any of its Controlled Group Members is making or accruing an obligation to make contributions, or (iii) under which the Company, any Subsidiary or any of its Controlled Group Members has any liability under the Code, or (b) in the context of compensation arrangements with employees, officers and directors, any other formal or informal obligation to, arrangement with, or plan or program for the benefit of, employees, officers and directors, of the Company or any of its Subsidiaries, including, but not limited to, stock options, stock bonuses, stock purchase agreements, bonuses, incentive compensation, deferred compensation, supplemental pensions, vacations, severance pay, insurance or (c) in context of compensation arrangements with employees, officers and directors, any other benefit, program, arrangement or practice not included in (a) or (b) above.

"**Post Closing Tax Return**" has the meaning given in <u>Section 5.3</u>.

"**Principal Stockholders**" has the meaning given in the preamble of this Agreement.

"**Pro Rata Portion**" means a fraction, the numerator of which is one (1), and the denominator of which is the total number of shares of Common Stock outstanding on a fully diluted basis immediately prior to the Effective Time (assuming full exercise of all securities of the Company which are convertible into, or exchangeable for, shares of Common Stock).

"**Purchase Price**" has the meaning given in <u>Section 2.2(a)</u>.

"**Representatives**" means a party's officers, directors, employees, limited liability company managers, agents, attorneys, consultants, advisors or other representatives.

"**Required Closing Cash**" has the meaning given in Section 6.2(i).

"**Retained Shares**" means certain of the Shares held by the Company under the column "Retained Shares" set forth on <u>Schedule A</u> hereto

"**Securities Act**" means the Securities Act of 1933, as amended, modified or supplemented from time to time, or any successor statute.

"**Series A Preferred Stock**" has the meaning given in the first recital.

"**Series B Preferred Stock**" has the meaning given in the first recital.

"**Series C Preferred Stock**" has the meaning given in the first recital.

"**Settlement Agreement**" means the Separation Agreement, General Release and Covenant Not To Sue, dated May 4, 2005, by and between the Company and Valerie Schmidt.

"**Shares**" has the meaning given in Section 2.3(b).

"**Stockholder**" means each holder of any shares (other than the Retained Shares) of the capital stock of the Company.

"**Stockholders' Representative**" has the meaning given in Section 9.13.

"**Subsidiary" or "Subsidiaries**" means, with respect to any Person, (a) a corporation a majority of whose capital stock with voting power, under ordinary circumstances, to elect directors is at the time, directly or indirectly, owned by such Person, by a Subsidiary of such Person, or by such Person and one or more Subsidiaries of such Person; (b) a partnership in which such Person or a Subsidiary of such Person is, at the date of determination, a general partner of such partnership; or (c) any other Person (other than a corporation) in which such Person, a Subsidiary of such Person or such Person and one or more Subsidiaries of such Person, directly or indirectly, at the date of determination thereof, has (i) at least a majority ownership interest; (ii) the power to elect or direct the election of the directors or other governing body of such Person; or (iii) the power to direct or cause the direction of the affairs or management of such Person.

"**Subsidiary Formation Documents**" has the meaning given in Section 3.1(c).

"**Subsidiary Governance Documents**" has the meaning given in Section 3.1(c).

"**Survival Period**" has the meaning given in Section 8.1.

"**Surviving Class A Common Stock**" means the Class A common stock of Surviving Corporation as set forth in the Certificate of Incorporation.

"**Surviving Class B Common Stock**" means the Class B common stock of the Surviving Corporation as set forth in the Certificate of Incorporation.

"**Surviving Corporation**" has the meaning given in Section 2.1(a).

"**Tax**" or "**Taxes**" has the meaning given in Section 3.8(a).

"**Tax Benefit**" has the meaning given in <u>Section 8.6(a)</u>.

"**Tax Return**" has the meaning given in <u>Section 3.8(a)</u>.

"**Total Merger Consideration**" means the aggregate amount of the Merger Consideration to be paid for the Merger Shares as set forth in <u>Section 2.3</u>

## ARTICLE II
## MERGER

2.1    <u>Merger</u>.

<u>The Merger</u>. Upon the terms and subject to the conditions of this Agreement, and in accordance with the DGCL, on the date hereof, Newco shall be merged with and into the Company. As a result of the Merger, the separate corporate existence of Newco shall cease and the Company shall continue as the surviving corporation following the Merger (the "**Surviving Corporation**"). The corporate existence of the Company shall continue unaffected and unimpaired by the Merger and, as the Surviving Corporation, it shall be governed by the laws of the State of Delaware.

(a) <u>Effective Time</u>. Subject to the satisfaction or waiver of the conditions set forth in <u>Article VII</u>, on the date hereof, the Parties hereto shall cause the Merger to be consummated by filing a certificate of merger (the "**Certificate of Merger**"), with the Secretary of State of the State of Delaware and by making all other filings or recordings required under the DGCL in connection with the Merger, in such form as is required by, and executed in accordance with the relevant provisions of, the DGCL. The Merger shall become effective at such time as the Certificate of Merger is duly filed with the Secretary of State of the State of Delaware, or at such other time as the Parties hereto agree and as shall be specified in the Certificate of Merger (the date and time the Merger becomes effective, the "**Effective Time**").

(b) <u>Effect of the Merger</u> At the Effective Time, the effect of the Merger shall be as provided in the applicable provisions of the DGCL. Without limiting the generality of the foregoing, at the Effective Time, all the property, rights, privileges, powers and franchises of the Company and Newco shall vest in the Surviving Corporation, and all debts, liabilities, obligations, restrictions, disabilities and duties of the Company and Newco shall become the debts, liabilities, obligations, restrictions, disabilities and duties of the Surviving Corporation.

(c) <u>Certificate of Incorporation and Bylaws</u>.

(i) The certificate of incorporation of Newco as of the Effective Time shall be the certificate of incorporation of the Surviving Corporation (the "**Certificate of Incorporation**"), until the same shall thereafter be altered, amended or repealed in accordance with applicable Law and such Certificate of Incorporation.

(ii) The bylaws of Newco as of the Effective Time shall be the bylaws of the Surviving Corporation (the "**Bylaws**"), until the same shall thereafter be altered, amended or repealed in accordance with applicable Law, the Certificate of Incorporation and such Bylaws

(d) <u>Directors and Officers</u>  From and after the Effective Time, until the earlier of their resignation or removal or until their respective successors are duly elected or appointed and qualified in accordance with applicable Law, (i) the directors of Newco at the Effective Time shall be the directors of the Surviving Corporation and (ii) the officers of Newco at the Effective Time shall be the officers of the Surviving Corporation.

### 2.2    Payment at Closing

(a)  On the date hereof, the Total Merger Consideration, minus the Escrow Funds, shall be delivered to the Stockholders' Representative by wire transfer of immediately available funds to an account that has been designated in writing by the Stockholders' Representative at least three (3) Business Days prior to the date hereof. There shall be no adjustment to the Total Merger Consideration following the date hereof.

(b)  On the date hereof, the sum of $2,000,000 (the "**Escrow Funds**") shall be paid by the Parent on behalf of the holders of Merger Shares at Closing and deposited into an interest bearing escrow account (the "**Escrow Account**") with a mutually agreeable escrow agent to be governed by the terms of this Agreement and of an Escrow Agreement, substantially in the form attached hereto as <u>Exhibit A </u>(the "**Escrow Agreement**"). The purpose of the Escrow Funds, as more fully set forth elsewhere in this Agreement and in the Escrow Agreement, shall be to provide funds to reimburse the Parent for the payment of any Damages pursuant to the terms of <u>Article VIII</u>. The Escrow Fund shall be held as a trust fund and shall not be subject to any Encumbrance, attachment or other judicial process of any creditor of any Person, and shall be held and disbursed solely for the purposes and in accordance with the terms hereof and of the Escrow Agreement.

### 2.3    Conversion of Shares

At the Effective Time, by virtue of the Merger and without any action on the part of the Parent, Newco, the Company or the holders of any of the following securities:

(a)  Prior to the date hereof, each share of Preferred Stock shall have been converted to Common Stock in accordance with the terms and conditions set forth in the Company Certificate.

(b)    Subject to the other provisions of this <u>Section 2.3</u>, each share of Common Stock (collectively, the "**Shares**") issued and outstanding immediately prior to the Effective Time (other than (i) shares held in the Company's treasury and (ii) Retained Shares) (each, a "**Merger Share**") shall be canceled and converted into the right to receive an amount equal to the product of (1) $44,000,000, less (y) all obligations of the Company for Indebtedness as of the Closing Date, less (z) the expenses incurred or to be incurred by the Company and the Stockholders in connection with the transactions contemplated hereby as set forth in Section 9.9, <u>multiplied</u> by (2) the Pro Rata Portion (the "**Merger Consideration**"); *provided*, that the aggregate amount of the Merger Consideration payable to any such holder in cash shall be reduced dollar-for-dollar by the dollar amount, if any, such holder owes to the Company.

(c)    The Merger Consideration shall be paid as follows:

(i)    upon surrender of the certificate that formerly evidenced such Merger Share (a "**Certificate**"), the Merger Consideration for each Merger Share (other than the pro rata portion of the Escrow Funds which would otherwise payable with respect to such Merger Share, which has been deposited into the Escrow Account in accordance with Section 2.2) shall be distributed to the holder thereof by the Stockholders' Representative in accordance with Section 2.3 of the Disclosure Schedule, as modified by any agreement amongst the Stockholders and the Stockholders' Representative (it being acknowledged and agreed that neither the Parent nor Newco shall have any responsibility or liability for the distribution of the funds to the Stockholders by the Stockholders' Representative or any such agreement).

(ii)    As of the Effective Time, by virtue of the Merger and upon surrender by the Company of the Retained Shares to Newco, each Retained Share shall be deemed contributed to Newco in a transaction governed by Code Section 351 in exchange for (A) a number of shares of Newco Class A Common Stock equal to [____] divided by the aggregate number of Retained Shares

(d)    From and after the Effective Time, the holders of Certificates shall cease to have any rights with respect thereto, except the right to receive the applicable Merger Consideration in accordance with this Section 2.3.

(e)    Each Share held in treasury of the Company and each Share owned by the Parent, Newco, or any direct or indirect wholly owned subsidiary of the Parent or of the Company immediately prior to the Effective Time shall be canceled without any conversion thereof, and no payment or distribution shall be made with respect thereto.

(f)    Each share of Newco Class A Common Stock issued and outstanding immediately prior to the Effective Time shall be converted into and become one validly issued, fully paid and nonassessable share of Surviving Class A Common Stock and shall constitute the only outstanding shares of Surviving Class A Common Stock of the Surviving Corporation.

(g)    Each share of Newco Class B Common Stock issued and outstanding immediately prior to the Effective Time shall be converted into and become one validly issued, fully paid and nonassessable share of Surviving Class B Common Stock and shall constitute the only outstanding shares of Surviving Class B Common Stock of the Surviving Corporation.

(h)    All cash paid upon conversion of the Shares in accordance with the terms of this Article II shall be deemed to have been paid and issued in full satisfaction of all rights pertaining to such Shares.

(i)    If any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such Certificate to be lost, stolen or destroyed and, if required by the Parent, providing the Parent with indemnity against any claim that may be made against it with respect to such Certificate, the Parent will issue the Merger Consideration in exchange for such lost, stolen or destroyed Certificate.

**2.4**    **Stock Transfer Books**.

At the Effective Time, the stock transfer books of the Company shall be closed, and there shall be no further registration of transfers of Shares thereafter on the records of the Company. From and after the Effective Time, the holders of Certificates representing Shares outstanding immediately prior to the Effective Time shall cease to have any rights with respect to such Shares, except as otherwise provided in this Agreement or by Law.

**2.5**    **Time and Place of Closing**

The closing of the Merger (the "**Closing**") will take place on the date hereof, (the "**Closing Date**") or at such other time as the Parties agree. The Closing shall be held at the offices of Kirkland and Ellis LLP, 153 East 53rd Street, New York, NY 10022 or at such other location as may be agreed upon by the Parties.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES CONCERNING COMPANY**

Except as set forth in the Disclosure Schedule, the Company represents and warrants to the Parent and Newco, on the date hereof, as follows:

**3.1**    **Organization, Standing and Power**.

(a) Each of the Company and each Subsidiary of the Company is an entity duly organized, validly existing and in good standing under the Laws of the state of its organization and has the requisite corporate or other power and authority necessary to enable it to own, lease or otherwise hold its properties and assets and to conduct its business as currently conducted.

(b) The Company and each Subsidiary is duly qualified to do business in each jurisdiction where the nature of its business or its ownership or leasing of its properties make such qualification necessary.

(c)    The Company has delivered to the Parent true, correct and complete copies of the certificate of incorporation of the Company, as amended to the date of this Agreement (as so amended, the "**Company Certificate**"), and the Bylaws of the Company, as amended to the date of this Agreement (as so amended, the "**Company Bylaws**"), together with complete copies of the formation documents of the Company's Subsidiaries (the "**Subsidiary Formation Documents**") and the bylaws or similar governing documents of the Company's Subsidiaries (the "**Subsidiary Governance Documents**").

(d)    The Company Certificate, the Company Bylaws, the Subsidiary Formation Documents and the Subsidiary Governance Documents are in full force and effect, and no other organizational documents are applicable to or binding upon the Company or any of its Subsidiaries.

(e)    Neither the Company nor any of its Subsidiaries is in violation of any provision of the Company Certificate, the Company Bylaws, the Subsidiary Formation Documents or the Subsidiary Governance Documents.

### 3.2    Subsidiaries; Equity Interests

The Company has no subsidiaries and does not own, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity or ownership interest in any Person, except as set forth in Section 3.2 of the Disclosure Schedule, which Section of the Disclosure Schedule sets forth with respect to each Subsidiary (a) its name and jurisdiction of incorporation, (b) the number of authorized shares for each class of its capital stock, (c) the number of issued and outstanding shares of each class of its capital stock, (d) the number of shares of its capital stock held in treasury, and (e) its directors and officers. All of the issued and outstanding shares of capital stock of each Subsidiary of the Company have been duly authorized and are validly issued, fully paid, and non-assessable. The Company or one or more of its Subsidiaries hold of record and own beneficially all of the outstanding shares of each Subsidiary of the Company, free and clear of any restrictions on transfer (other than restrictions under the Securities Act and state securities laws), Taxes, Liens, options, warrants, purchase rights, contracts, commitments, equities, claims, and demands. There are no outstanding warrants, rights, calls, options, agreements, convertible or exchangeable securities or other commitments, pursuant to which any Subsidiary is or will become obligated to issue, sell, purchase, return or redeem any shares, options or other securities or shares of capital stock of such Subsidiary, and no shares, options or other securities or shares of capital stock of any Subsidiary are reserved for issuance for any purpose. There are no voting trusts, proxies, or other agreements or understandings with respect to the voting of any capital stock of any Subsidiary of the Company. The minute books (containing the records of meetings of the stockholders, the board of directors, and any committees of the board of directors), the stock certificate books, and the stock record books of each Subsidiary of the Company are correct and complete

### 3.3    Capital Structure

As of the date of hereof and at the Effective Time:

(a) The authorized capital stock of the Company consists of (i) 2,074,750 shares of Common Stock, of which 130,500 shares are validly issued and outstanding, fully paid and nonassessable, and 250,000 shares of which are reserved for issuance upon exercise of options granted or to be granted under the Company's stock option plan, including 144,500 outstanding options already granted pursuant to the Company's stock option plan; and (ii) 1,725,250 shares of Preferred Stock, of which (A) 683,250 shares are designated as Series A Preferred Stock, all of which shares are issued and outstanding, (B) 150,000 shares of which are designated as Series B Preferred Stock, all of which shares are issued and outstanding, and (C) 892,000 shares of which are designated as Series C Preferred Stock, 887,000 shares of which are issued and outstanding

(b) The Stockholders and the number of Shares owned by each and the Retained Shares are set forth in Section 3.3 of the Disclosure Schedule. No Encumbrance exists with respect to any Shares. There are no outstanding warrants, rights, calls, options, agreements, convertible or exchangeable securities or other commitments (other than this Agreement), pursuant to which the Company is or will become obligated to issue, sell, purchase, return or redeem any Shares, options or other securities or shares of capital stock of the Company, and no Shares, options or other securities or shares of capital stock of the Company are reserved for

issuance for any purpose, except as set forth on <u>Section 3.3</u> of the Disclosure Schedule. Neither the Company nor any of its Subsidiaries has received any written notice from a Stockholder stating that such Stockholder will seek to exercise his or her statutory appraisal or dissenter rights.

### 3.4    **Authority; Execution and Delivery; Enforceability**.

The Company has the requisite corporate power and authority to execute and deliver this Agreement and the other agreements contemplated hereby, to perform its obligations hereunder and thereunder and to consummate the Merger. The execution and delivery of this Agreement and the other agreements contemplated hereby by the Company and the consummation by the Company of the Merger has been duly and validly authorized by all necessary corporate action and no other corporate proceedings on the part of the Company are necessary to authorize this Agreement and the other agreements contemplated hereby or to consummate the Merger. This Agreement has been, and upon execution the other agreements contemplated hereby to which the Company will be bound (other than the Employment Agreements referred to in <u>Section 6.2(f)</u>) will be, duly executed and delivered by, and constitute valid and binding obligations of, the Company and, assuming due authorization, execution and delivery by the Parent and Newco, are and will be enforceable against the Company in accordance with its terms, except as enforcement may be limited by general principles of equity whether applied in a court of law or a court of equity and by bankruptcy, insolvency and similar laws affecting creditors' rights and remedies generally, except for any provisions as to non-competition, as to which no representations or warranties are made.

### 3.5    **No Conflicts; Consents**.

(a)    Except as set forth in <u>Section 3.5</u> of the Disclosure Schedule, the execution, delivery and performance by the Company of this Agreement and the other agreements contemplated hereby by the Company and the consummation of the Merger will not:

(i)    conflict with or result in any violation of any provision of the Company Certificate, the Company Bylaws, the Subsidiary Formation Documents or the Subsidiary Governance Documents;

(ii)    subject to the filings and other matters referred to in <u>Section 3.5(b)</u>, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation, or result in the creation of any Lien upon any of the properties or assets of the Company or any of its Subsidiaries under, or require the consent of any Person under, any provision of any contract, lease, license, indenture, note, bond, agreement, Permit, concession, franchise or other instrument (a "**Contract**") to which the Company or any of its Subsidiaries is a party or by which any of their properties or assets are bound or affected; or

(iii)    subject to the filings and other matters referred to in <u>Section 3.5(b)</u>, conflict with or result in any violation of any domestic or foreign judgment, verdict, jury award, injunction, order or decree ("**Judgment**") or domestic or foreign Law applicable to the Company or any of its Subsidiaries or their respective properties or assets,

(b)    Except as set forth in <u>Section 3.5</u> of the Disclosure Schedule, no consent, approval, license, permit, order or authorization ("**Consent**") of, or registration, declaration or filing with, or notice to, or Permit from, any Governmental Entity is required to be obtained or made by or with respect to the Company or any of its Subsidiaries in connection with the execution, delivery and performance of this Agreement or the other agreements contemplated hereby or the consummation of the Merger, other than such filings as may be required after the consummation of the Merger to reflect the fact that the Merger has been consummated.

### 3.6    **Financial Statements; Undisclosed Liabilities**

(a)    The Company's unaudited financial statements for the eight month period ended August 31, 2005 (the "**Most Recent Financial Statements**"), and the audited financial statements for the fiscal year ended December 31, 2004 (collectively, the "**Financial Statements**") (i) were prepared from the books of account or other financial records of the Company, (ii) were prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except for the lack of footnotes in the unaudited financial statements), and (iii) fairly present in all material respects the financial position of the Company at the respective dates and the results of operations and cash flows for the periods indicated, except that the interim consolidated financial statements were or are subject to normal and recurring year-end adjustments.

(b)    Neither the Company nor any of its Subsidiaries has any liability and, there is no existing fact, condition or circumstance which could reasonably be expected to result in such liabilities, except for (i) liabilities reflected on the Financial Statements, (ii) liabilities that have arisen after the Most Recent Financial Statements in the ordinary course of business (none of which results from, arises out of, relates to, is in the nature of, or was created by any breach of contract, breach of warranty, tort, infringement or violation of law), and (iii) liabilities set forth in <u>Section 3.6(b)</u> of the Disclosure Schedule.

### 3.7    <u>**Absence of Certain Changes or Events**</u>.

Except as set forth in <u>Section 3.7</u> of the Disclosure Schedule, since May 31, 2005, the Company and its Subsidiaries have conducted their respective businesses only in the ordinary course of business, and nothing has occurred which could reasonably be expected to have caused a Material Adverse Effect. Without limiting the foregoing, there has not, other than in the ordinary course of business, been:

(a)    any (i) grant by the Company or any of its Subsidiaries to any director or officer of the Company or any of its Subsidiaries of any increase in compensation, bonus or other benefits, (ii) grant or increase by the Company or any of its Subsidiaries to any such director or officer of any severance, change of control or termination pay benefits, or (iii) entry by the Company or any of its Subsidiaries into, or any amendment of, any employment, consulting, deferred compensation, indemnification, severance, change of control or termination agreement or arrangement with any such director or officer;

(b)    any establishment, adoption or amendment of any Plan;

(c)    any change in accounting methods, principles or practices by the Company or any of its Subsidiaries, except for such changes as may have been required by a change in GAAP;

(d)    any (i) material elections with respect to Taxes by the Company or any of its Subsidiaries, (ii) settlement or compromise by the Company or any of its Subsidiaries of any material Tax liability or refund or (iii) assessment of a material Tax against the Company or any of its Subsidiaries by any Governmental Entity;

(e)    any incurrence, assumption or guarantee by the Company or any of its Subsidiaries of any indebtedness for borrowed money or capitalized lease obligations;

(f)    any making of any loan, advance or capital contribution to or investment in any Person by the Company or any of its Subsidiaries;

(g)    any (i) acquisition by the Company or any of its Subsidiaries by merging or consolidating with, or by purchasing a substantial equity interest in or a substantial portion of the assets of, or by any other manner, any business or any corporation, partnership, joint venture, association or other business organization or division thereof or any acquisition by the Company or any of its Subsidiaries of any assets (other than inventory) that are material to the Company and its Subsidiaries, taken as a whole, (ii) sale, lease, license, encumbrance or other disposition of material assets of the Company and its Subsidiaries, taken as a whole, other than in the ordinary course of business, or (iii) incurrence of capital expenditures by the Company or any of its Subsidiaries, other than in the ordinary course of business;

(h)    any loan to, or agreement entered into with, any of the Company's officers, directors or employees, excluding items related to the reimbursement or advancing of travel and entertainment expenses consistent with the Company's policies;

(i) any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) involving consideration of more than $10,000 with the Company or any of its Subsidiaries;

(j) any acceleration, termination, modification, or cancellation of any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) involving consideration of more than $10,000 to which Company or any of its Subsidiaries is a party or by which any of them is bound by any party, including the Company or any of its Subsidiaries;

(k) any capital expenditure (or series of related capital expenditures) involving more than $10,000 by the Company or any of its Subsidiaries;

(l) any capital investment in, any loan to, or any acquisition of the securities or assets of, any other Person (or series of related capital investments, loans, and acquisitions) involving more than $10,000 by the Company or any of its Subsidiaries;

(m)any transfer assignment, or grant of any license or sublicense of any rights under or with respect to any Intellectual Property by the Company or any of its Subsidiaries;

(n) any change made or authorized in the charter or bylaws or other organizational documents of any of Company and its Subsidiaries;

(o) any issuance, sale, or otherwise disposition of any of its capital stock, or the grant of any options, warrants, or other rights to purchase or obtain (including upon conversion, exchange, or exercise) any of its capital stock by the Company or any of its Subsidiaries;

(p) any damage, destruction, or loss in excess of $10,000 to its tangible property experienced by the Company or any of its Subsidiaries, which is not fully covered by insurance of the Company;

(q) any grant of any increase in the base compensation of any of its directors, officers, and employees outside the ordinary course of business by the Company or any of its Subsidiaries;

(r) any charitable or other capital contribution or pledge to make such charitable or other capital contribution outside the ordinary course of business by the Company or any of its Subsidiaries;

(s) any discharge of a material liability or Lien outside the ordinary course of business by the Company or any of its Subsidiaries; or

(t) any agreement, commitment or undertaking to take any action referred to in Sections 3.7(a) through 3.7(s).

### 3.8    **Taxes**.

Except as set forth in <u>Section 3.8</u> of the Disclosure Schedule:

(a)    The Company and its Subsidiaries have filed when due with the appropriate Governmental Entity, all tax returns, estimates, information and reports ("**Tax Returns**") required to be filed by the Company or any of its Subsidiaries with respect to all federal, state, local or foreign taxes, levies, imposts, duties, licenses and registration fees, and similar charges, including, without limitation, income taxes, capital taxes, estimated taxes, unemployment and social security withholding taxes, sales and use taxes, real estate transfer taxes, real estate and personal property taxes, franchise taxes, and interest, penalties and additions to tax with respect thereto ("**Taxes**" or "**Tax**"). The Company and its Subsidiaries have paid all Taxes that have become due and payable and, to the extent of Taxes not yet due and payable, the Company and its Subsidiaries have made required estimated payments of or accrued or otherwise adequately reserved in accordance with GAAP for the payment of all Taxes. All such filed Tax Returns are correct and complete in all material respects. Neither the Company nor any of its Subsidiaries has received written notice from any Governmental Entity in a jurisdiction in which it does not file a Tax Return stating that it is or may be subject to taxation by that jurisdiction. Neither the Company nor any of its Subsidiaries is a party to or bound by any agreement providing for the allocation or sharing of Taxes. There are no Liens for Taxes (other than Taxes not yet due and payable) upon any of the assets of the Company or any of its Subsidiaries.

(a)    No Tax Return of the Company nor any of its Subsidiaries has been since January 1, 1999, or is currently being audited, or, to the Knowledge of the Company, examined, by the Internal Revenue Service (the "**IRS**") or other taxing authority. Neither the Company nor any of its Subsidiaries has executed or filed with the IRS or any other taxing authority any agreement, waiver, or other document extending, or having the effect of extending, the period for assessment or collection of any Taxes, which extension or waiver is still in effect. The Company has delivered or made available to the Parent correct and complete copies of all examination reports, statements of deficiencies and similar documents prepared by the IRS or any other taxing authority with respect to the Company or any of its Subsidiaries that have been received by either the Company or any of its Subsidiaries (if any) since January 1, 1999. All final adjustments made by the IRS with respect to any Tax Return of the Company or any of its Subsidiaries filed since January 1, 1999 have been reported to the relevant state, local, or foreign taxing authorities to the extent required by law. No requests for ruling or determination letters filed by the Company or any of its Subsidiaries are pending with any taxing authority.

(b)    Neither the Company nor any of its Subsidiaries (i) has a permanent establishment in any foreign country or operates or conducts a business through any branch in any foreign country, (ii) has agreed to or is required to make any adjustment pursuant to Section 481(a) of the Code or any similar provision of state, local or foreign Law by reason of a change in the accounting method initiated by either the Company or any of its Subsidiaries, (iii) to the Knowledge of the Company, the Company has not received a proposal from the IRS or any other Governmental Entity regarding any such adjustment or change in accounting method, or (iv) has executed or entered into a closing agreement pursuant to Section 7121 of the Code or any predecessor provision thereof or any similar provision of state, local or foreign law.

(c)    The consummation of the Merger will not (either alone or upon the occurrence of any additional or subsequent event) result in any payment that would constitute an "excess parachute payment" within the meaning of Section 280G of the Code.

(d)    Copies of all Tax Returns required to be filed by the Company or any of its Subsidiaries (including any predecessors) for each of the last four (4) years, together with all schedules and attachments thereto, have been delivered or made available to the Parent.

(e) Neither the Company nor any of its Subsidiaries has waived any statue of limitations in respect of Taxes or agreed to any extension of time in respect to a Tax assessment or definition. Each of Company and its Subsidiaries have withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, Stockholder, or other third party.

(f) No written claim has been made since January 1, 1999 by an authority, a jurisdiction where the Company or any of its Subsidiaries does not file Tax Returns that the Company or any of its Subsidiaries is or may be subject to taxation by that jurisdiction.

### 3.9    **Employee Benefit Plans.**

(a)    Section 3.9 of the Disclosure Schedule contains a complete and accurate list of all Plans relating to the Company's or any Subsidiary's employees, officers or directors. Neither the Company nor any of its Subsidiaries has any commitment to create any additional

Plan or to modify or change any existing Plan in any material respect, except as may be required by any applicable Law. The Company or a Subsidiary has made available to the Parent all documents evidencing any Plan, including plan documents, insurance contracts and summary plan descriptions, as well as the three (3) most recently filed annual reports (Form 5500) for each Plan for which such a filing is required, the most recent favorable determination letter from the IRS and all related trust agreements, insurance contracts and other funding arrangements which implement each Plan.

(b)     Each Plan has been maintained, funded and administered in compliance in all material respects with the terms of such Plan and the provisions of all applicable Laws and regulations insofar as such statutes are applicable to such Plan. Each Plan that is intended to be a tax-qualified plan meeting the requirements of Section 401(a) of the Code has been determined by the IRS to meet such requirements, and is the subject of a favorable determination letter that is currently effective, is the subject of an IRS opinion letter that such plan is established using a prototype plan document that does not require a determination letter or an application for favorable determination letter has been timely filed with the IRS and is currently pending before the IRS and the Company and its Subsidiaries are not aware of any facts or circumstances that could reasonably be expected to adversely effect the qualified status of any such Plan. Each such Plan has been timely amended to comply with the recent tax legislation commonly known as "GUST" and "EGTRRA"

(c)     None of the Company, its Subsidiaries or its Controlled Group Members has any liability to a Plan, a Governmental Entity (other than for premiums or contributions not yet due), or any other Person in respect of any Plan. None of the Company, its Subsidiaries or its Controlled Group Members has contributed to, or incurred any liability in connection with, a "multiemployer plan," within the meaning of Section 3(37) (A)-(D) of ERISA.

(d)     None of the Company, its Subsidiaries or its Controlled Group Members has maintained, at any time in the last five (5) years, a defined benefit plan, as defined in Section 3(35) of ERISA, subject to Title IV of ERISA, or has any liability for any such plan under Title IV of ERISA or otherwise. No asset of the Company or any Subsidiary is subject to any Lien arising pursuant to Section 412 of the Code or 4068 of ERISA.

(e)     There are no actions, suits, proceedings, audits, investigations or claims pending or, to the Knowledge of the Company or its Subsidiaries, threatened with respect to any Plan, other than routine claims for benefits, which could reasonably be expected to result in liability to the Company or any of its Subsidiaries

(f)     None of the Company, its Subsidiaries or its Controlled Group Members has any obligation other than as required under Section 4980B of the Code or Part 6 of Title I of ERISA, to provide post-retirement health, life or welfare-type benefits to former employees.

(g)     All contributions (including all employer contributions and employee salary reduction contributions) that are due have been made within the time periods prescribed by ERISA and the Code to each Plan and all contributions for any period ending on or before the Closing Date that are not yet due have been made to each Plan or properly accrued. All

premiums or other payments for all periods ending on or before the Closing Date have been paid with respect to each Plan.

(h)    There have been no "prohibited transactions" (as defined in Section 406 of ERISA and 4975 of the Code) with respect to any Plan and no "fiduciary" (as defined in Section 3(21) of ERISA) has any liability for material breach of fiduciary duty or any other material failure to act or comply in connection with the administration or investment of the assets of any Plan.

(i) Neither the execution and delivery of this Agreement or the other transaction documents to which the Company or any Subsidiary is a party, nor the consummation of these transactions contemplated hereby or thereby will (i) result in any payment (including without limitation, severance, unemployment compensation, parachute or otherwise) becoming due to any current or former employee, officer, director, contractor or agent of the Company or any Subsidiary, (ii) significantly increase any benefits otherwise payable under any Plan, or (iii) result in any acceleration of the time of payment or vesting of any benefits under any Plan.

(j) The Company and the Subsidiaries have, for purposes of ea h Plan, correctly classified those individuals performing services for the Company or the Subsidiaries as common law employees, leased employees, independent contractors or agents.

(k) Neither the Company nor any of its Subsidiaries has sine October 3, 2004, (A) granted an interest in a nonqualified deferred compensation plan (as defined in Section 409A(d)(1) of the Code which interest has been or upon, the lapse of a substantial risk of forfeiture with respect to such interest, will be subject to the tax imposed by Sections 409(A)(1)(B) or (b)(4)(A) of the Code, or (B) modified the terms of any nonqualified deferred compensation plan in a manner that could cause an interest previously granted under such plan to become subject to the tax imposed by Sections 409A(a)(1)(B) or (b)(4) of the Code.

(l) No plan has two or more contributing sponsors at least two whom are not under common control, within the meaning of Section 4063 of ERISA None of the Company, the Subsidiaries or any Controlled Group Member maintains, sponsors, contributes to or is required to contribute to, or has any liability with respect to, any "multiple employer welfare arrangement" as such term is defined in Section 3(40) of ERISA.

### 3.10    Labor and Employment Matters

(a)    To the Knowledge of the Company, the Company and its Subsidiaries are in compliance in all respects with all applicable Laws respecting employment and employment practices and terms and conditions of employment.

(b)    No union representation exists respecting the employees of the Company or any of its Subsidiaries and, to the Knowledge of the Company, no union organizing or decertification activities are taking place or threatened. Neither the Company nor its Subsidiaries are a party to any collective bargaining agreement with any labor organization

(c)    With respect to the business of Company and its Subsidiaries, except as disclosed in Section 3.10 of the Disclosure Schedules:

(i)     to the Knowledge of the Company, or any of its Subsidiaries, no executive or manager of Company or any of its Subsidiaries (1) has any present intention to terminate his or her employment, or (2) is a party to any confidentiality, non-competition, proprietary rights or other such agreement between such employee and any Person that would be material to the performance of such employee's employment duties, or the ability of such entity or Parent to conduct the business of such entity;

(ii)     Since December 31, 2004, no labor strike, work stoppage, slowdown, or other material labor dispute has occurred, and none is currently underway or, to the Knowledge of Company or any of its Subsidiaries, threatened;

(iii)     there is no workman's compensation liability, experience or matter that could reasonably be expected to have a Material Adverse Effect;

(iv)     there is no employment-related charge, complaint, grievance, investigation, or inquiry, pending or threatened in any forum, relating to an alleged violation or breach by Company or any of its Subsidiaries (or its or their officers or directors) of any law, regulation or contract relating to employment matters;  nd,

(v)     to the Knowledge of the Company no employee or agent of Company or any of its Subsidiaries has committed any act or omission giving rise to material liability for any violation or breach identified in subsection (iv) above.

(d) Except as set forth in Section 3.10 of the Disclosure Schedule, (A) there are no employment contracts or severance agreements with any employees of Company or any of its Subsidiaries, and (B) there are no written Company personnel policies, rules or procedures applicable to employees of Company or any of its Subsidiaries.

(e) With respect to this transaction, any notice required under any law or collective bargaining agreement has been given, and all bargaining obligations with any employee representative have been, or prior to the Closing Date will be, satisfied   Within the past 3 years, neither Company nor any of its Subsidiaries has implemented any plant closing or layoff of employees that could implicate the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar foreign, state, or local law, regulation, or ordinance (collectively, the "**WARN Act**").

### 3.11    <u>Litigation</u>

(a)     Except as set forth in <u>Section 3.11</u> of the Disclosure Schedule, there is no suit, action, proceeding or investigation pending against, or to the Knowledge of the Company threatened against, the Company or any of its Subsidiaries or any of their respective properties, including any condemnation, expropriation or other proceedings in eminent domain, before any Governmental Entity.

(b)     Except set forth in <u>Section 3.11</u> of the Disclosure Schedule, neither the Company nor any of its Subsidiaries is subject to any outstanding injunction, judgment, order, decree, ruling or charge by any Governmental Entity.

(c)    Except as set forth in <u>Section 3.11</u> of the Disclosure Schedule, there are no suits, claims, actions, proceedings or investigations pending or, to the Knowledge of the Company, threatened, seeking to prevent, hinder, modify or challenge the Merger.

(d)    Neither the Company nor any of its Subsidiaries is subject to any outstanding Judgment against them or naming them as a party.

(e)    All obligations under the Settlement Agreement have been completely and fully discharged as of the date hereof.

### 3.12    <u>Compliance with Applicable Laws</u>.

(a)    Except as set forth on <u>Section 3.12</u> of the Disclosure Schedule, the Company and each of its Subsidiaries is, and their operations are being conducted, in compliance with all applicable Laws.

(b)    The Company and each of its Subsidiaries, has in effect all approvals, authorizations, certificates, filings, franchises, licenses, notices, permits and rights of or with all Governmental Entities ("**Permits**") necessary for it to own, lease or otherwise hold and  o operate its properties and assets and to carry on its business and operations as now conducted. Neither the Company nor any of its Subsidiaries has received written notice of any defaults under, or violations of, any such Permit.  The Merger, in and of itself, would not cause the revocation or cancellation of any such Permit.

(c)    This <u>Section 3.12</u> does not relate to matters with respect to Taxes, which are the subject of <u>Section 3.8</u>, or to environmental matters, which are the subject of <u>Section 3.12</u>.

### 3.13    <u>Environmental Matters</u>.

Except as set forth in <u>Section 3.13</u> of the Disclosure Schedule:

(a)    the Company and each of its Subsidiaries has complied and is in compliance with all applicable Environmental Laws;

(b)    the Company and each of its Subsidiaries holds, has complied and is in compliance with all Permits required to conduct its business and operations under all applicable Environmental Laws;

(c)    neither the Company nor any of its Subsidiaries has received any written Environmental Claim against it, and the Company does not have Knowledge of any such Environmental Claim being threatened;

(d)    no Hazardous Substance or other conditions are present on any property now or previously owned, leased or operated by the Company at the time such property was owned, leased or operated by the Company, or any of its Subsidiaries, that are in violation of any applicable Environmental Laws or will form the basis of any Environmental Claim against the Company or any of its Subsidiaries or against any Person whose liability the Company or any of its Subsidiaries retained or assumed either contractually or by operation of Law;