# EXHBIIT B
# (CONTINUED)

(e) neither the Company nor any of its Subsidiaries has entered into or agreed to any Governmental Entity decree, order or agreement and, to the Company's Knowledge, is not subject to any judgment relating to compliance with, or to investigation or cleanup, or to liability, under any Environmental Law;

(f) neither the Company nor any of its Subsidiaries, nor any of their respective predecessors, has treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, released or exposed any person to any Hazardous Substance, or owned or operated any property or facility in a manner that has given will give rise to any liability, including any liability (contingent or otherwise) for response costs, corrective action costs, personal injury, property damage, natural resources damages or attorney fees, pursuant to any Environmental Laws; and

(g) the Company has provided to the Parent true and correct copies of all environmental audit, assessment or review reports, all environmental analytical results and all other documents materially bearing on the environmental health and safety liabilities of the Company and its Subsidiaries which are in its or their possession or control.

"**Environmental Claim**" means any claim, demand, action, suit, complaint, proceeding, directive, investigation, Lien, demand letter or notice of noncompliance, violation or liability by any Person asserting liability or potential liability (including liability or potential liability for enforcement, investigatory costs, cleanup costs, governmental response costs, natural resource damages, property damage, personal injury, fines or penalties) arising out of, based on or resulting from (x) the presence, discharge, emission, release or threatened release of any Hazardous Substance at any location, (y) circumstances forming the basis of any violation or alleged violation of any Environmental Law or any Permit issued under any Environmental Law, or (z) otherwise relating to obligations or liabilities under any Environmental Law.

"**Environmental Laws**" means any and all applicable federal, state or local statutes, regulations, ordinances, guidelines, codes, decrees, or other legally enforceable requirement (including common law) of any foreign government, the United States, or any state, local, municipal or other Governmental Entity, regulating, relating to or imposing liability or standards of conduct concerning protection of the environment (including indoor air, ambient air, surface water, groundwater, land surface, subsurface strata, or plant or animal species) or human health as affected by the environment or Hazardous Substances (including employee health and safety)

"**Hazardous Substance**" means all explosive or radioactive substances, materials or wastes, hazardous or toxic substances, materials or wastes, asbestos, asbestos-containing materials, pollutants and contaminants (including petroleum or any fraction thereof) and all other substances, materials or wastes, whether or not defined as such, that are regulated pursuant to or that could result in liability under any applicable Environmental Law.

3.14 <u>Contracts</u>

(a) Except as set forth in Section 3.14 of the Disclosure Schedule, neither the Company nor any of its Subsidiaries is a party to or bound by or otherwise subject to any Contracts of the following nature (collectively, the "**Material Contracts**"):

(i)  any Contract involving (A) the acquisition, merger or purchase of all or substantially all the assets or business of a third party, (B) the purchase or sale of assets, or a series of purchases and sales of assets, involving aggregate consideration of $100,000 or more or (C) the grant to any person of any preferential right to purchase any material asset or assets of the Company or any of its Subsidiaries;

(ii)  any Contract that contains a "change in control" or similar provision pursuant to which the execution and delivery of this Agreement, or the consummation of the Merger, could reasonably be expected to give rise to any right (including any right of termination, cancellation, acceleration or vesting) or benefit that could reasonably be expected to have a Material Adverse Effect;

(iii)  except for any Company Lease, any Contract, including any mortgage or other grant of security interest, guarantee or note, relating to the borrowing of money;

(iv)  any Contract to indemnify for any Environmental Claim or any other liability or cost with respect to any Environmental Law;

(v)  any Contract that would prohibit or materially delay the consummation of the Merger;

(vi)  any Contract (or group of related Contracts) for the lease of personal property to or from any Person providing for lease payments in excess of $25,000 per annum;

(vii)  any Contract concerning the Company's involvement in any partnership or joint venture;

(viii)  any Contract (or group of related Contracts) under which the Company has created, incurred, assumed, or guaranteed any indebtedness for borrowed money, or any capitalized lease obligation, or under which it has imposed a Lien on any of its assets, tangible or intangible;

(ix)  any Contract containing confidentiality or non-competition provisions entered into outside of the ordinary course of business;

(x)  any profit sharing, stock option, stock purchase, stock appreciation, deferred compensation, severance, or other material plan or arrangement for the benefit of its current directors, officers, and employees;

(xi)  any collective bargaining agreement;

(xii)  any Contract under which it has granted any Person any registration rights (including, without limitation, demand and piggyback registration rights);

(xiii)  any settlement or similar agreement, the performance of which will involve payment after the Closing Date of consideration in excess of $10,000;

(xiv) any Contract under which Company or any of its Subsidiaries has advanced or loaned any other Person amounts in the aggregate exceeding $10,000;

(xv) any other Contract (or group of related agreements), excluding any Contracts or agreements related to employment, the future performance of which involves consideration in excess of $50,000;

(xvi) any Contract containing non-competition provisions or any other provisions that restrict the Company or any of its Subsidiaries from engaging in any business or activity anywhere in the world; or

(xvii) any agreement under which it has advanced or loaned any amount to any of its directors, officers, and employees outside the ordinary course of business, excluding items related to the reimbursement or advancing of travel and entertainment expenses consistent with the Company's policies.

The Company has delivered or made available to the Parent a correct and complete copy of each written Material Contract listed in Section 3.14 of the Disclosure Schedule and a written summary setting forth the terms and conditions of each oral Material Contract referred to in Section 3.14 of the Disclosure Schedule. With respect to each such Material Contract: (A) it is the legal, valid, binding, and enforceable obligation of the Company, except to the extent enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting the enforcement of creditors rights generally, by applicable Law or by the effect of general principles of equity (regardless of whether enforcement is considered in a proceeding in equity or at law); (B) the agreement will continue to be legal, valid, binding, enforceable, and in full force and effect on substantially the same terms following the consummation of the transactions contemplated hereby, (C) neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any other party, is in breach or default under any Material Contract, and no event has occurred and is continuing that constitutes or, with notice or the passage of time or both, would constitute a breach or default under any Material Contract by the Company or any of its Subsidiaries or, to the Knowledge of the Company, any other party and (D) no party has repudiated any provision of the agreement

(b) Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, neither the Company nor any of its Subsidiaries is in breach or default (and no event has occurred that, with notice or the lapse of time or both, would constitute a breach or default by the Company or any of its Subsidiaries) under any Material Contract.

### 3.15  **Certain Business Practices**

Neither the Company, any of the Company's Subsidiaries, nor any of their current or former officers, directors, stockholders, employees, agents, or representatives, have in connection with the business or operations of the Company and its Subsidiaries (a) used any corporate funds for any contributions, gifts, entertainment or other expenses relating to political activity, or used any corporate funds to reimburse any person for any such payment in contravention of any laws, (b) used any corporate funds for any direct or indirect payments to any foreign or domestic government officials or employees, (c) violated any provision of the Foreign

Corrupt Practices Act of 1977, or (d) made any bribe, rebate, payoff, influence payment, kickback or other payment of any nature.

### 3.16 Personal and Real Property

(a) The Company does not own any real property.

(b) Section 3.16(b) of the Disclosure Schedule sets forth a true and complete list of all Company Leases (including all amendments, extensions, renewals, guarantees and other agreements with respect thereto) for each Leased Real Property and the address of each Leased Real Property. True and complete copies of all Company Leases, together with all modifications, extensions, amendments and assignments thereof, if any, have been furnished or made available to the Parent. No consent or approval of any lessor, sublessor, licensor, or similar party is necessary in connection with the Merger and the merger will not result in a breach of or default under any Company Lease, or otherwise cause any Company Lease to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing, except as set forth on Section 3.16(b) of the Disclosure Schedule. Except as set forth on Section 3.16(b) of the Disclosure Schedule with respect to each of the Company Leases: (i) neither the Company nor any of its Subsidiaries is a party to any lease, sublease, license, concession agreement, guaranty, use and occupancy agreement or assignment under which the Company or its Subsidiaries is a lessor or assignor or otherwise affecting any portion of such Company Lease, (ii) such Company Lease is the legal, valid, binding, and enforceable obligation of the Company and is in full force and effect; except to the extent enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting the enforcement of creditors rights generally, by applicable Law or by the effect of general principles of equity (regardless of whether enforcement is considered in a proceeding in equity or at law); (iii) the Company's or any of its Subsidiaries possession and quiet enjoyment of the Leased Real Property under such Company Lease is not being disturbed; (iv) neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any other party, is in breach or default under such Company Lease, and no event has occurred and is continuing that constitutes or, with notice or the passage of time or both, would constitute a breach or default, or permit the termination, modification or acceleration of rent under such Company Lease by the Company or any of its Subsidiaries or, to the Knowledge of the Company, any other party; (v) no security deposit or portion thereof deposited with respect to such Company Lease has been applied in respect of a breach or default under such Company Lease which has not been redeposited in full; (vi) neither the Company nor any of its Subsidiaries owes, and will not owe in the future, any brokerage commissions or finder's fees with respect to such Company Lease; and (vii) there are no liens or encumbrances on the estate or interest created by such Company Lease.

(c) All buildings, structures, improvements, fixtures, building systems and equipment, and all components thereof, included in the Leased Real Property (the "**Improvements**") are in good condition and repair, reasonable wear and tear excepted, and are sufficient for the operation of business by the Company and its Subsidiaries as presently conducted.

### 3.17 **Intellectual Property**

(a) The Company and each of its Subsidiaries owns and possesses all right, title and interest, free and clear of any Lien, or has the right to use pursuant to a valid and enforceable license set forth on Section 3.17(b) of the Disclosure Schedule, all trademarks, trade names, service marks, logos, slogans, Internet domain names, corporate names (together with all translations, adaptations, derivations and combinations thereof) and all goodwill associated with any of the foregoing, copyrights, copyrightable works, computer software, source code, executable code, data, databases and related documentation, inventions, improvements, technology, trade secrets, know-how, processes, methods, business information, and techniques, formulas, research and development information, drawings, specifications, manuals and designs, and any materials recording or evidencing data, expertise or other information, whether or not patentable or reduced to practice or copyrightable, all patents, registrations, and applications for any of the foregoing in any jurisdiction throughout the world, including continuations, reexaminations, reissues, renewals, divisionals and continuations-in-part, and all copies and tangible embodiments of any of the foregoing (in whatever form or medium) and other proprietary intellectual property rights ("**Intellectual Property**") necessary or used in the conduct of the business of the Company or any of its Subsidiaries as presently conducted ("**Company Intellectual Property**")

(b) Section 3.17(b) of the Disclosure Schedule contains a complete and accurate list of all of the following: (i) patented or registered Company Intellectual Property, (ii) pending patent applications or applications for registration of any Company Intellectual Property, (iii) computer software (other than off-the-shelf software with a replacement cost and/or annual license fee of less than $10,000), (iv) material unregistered Company Intellectual Property, including, without limitation, trade or corporate names, trade dress, logos, trademarks and service marks, and (v) license, royalty, indemnification or other agreements relating to the conveyance of or right to use any material Company Intellectual Property (other than licenses for off-the-shelf software with a replacement cost and/or annual license fee of less than $10,000), in each case identifying the subject Intellectual Property  Each license set forth in Section 3.17(b) of the Disclosure Schedule is the legal, valid, binding, and enforceable obligation of the Company, except to the extent enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting the enforcement of creditors rights generally, by applicable Law or by the effect of general principles of equity (regardless of whether enforcement is considered in a proceeding in equity or at law)  Neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any other party, is in breach or default under any of the licenses set forth in Section 3.17(b) of the Disclosure Schedule, and no event has occurred and is continuing that constitutes or, with notice or the passage of time or both, would constitute a breach or default under any such license by the Company or any of its Subsidiaries or, to the Knowledge of the Company, any other party, except for any breaches or defaults that do not or could not reasonably be expected to result in a Material Adverse Effect

(c) The Company and its Subsidiaries have taken all commercially reasonable, customary and necessary action to maintain and protect the Company Intellectual Property that is owned or has been created for, by, or on behalf of the Company  All past and present employees of, and consultants to, the Company and its Subsidiaries have executed agreements requiring such employees or consultants to maintain the confidentiality of the Company's and its

Subsidiaries' confidential and proprietary information, an to assign to the Company or its Subsidiaries, as applicable, all Intellectual Property created or developed by such employees or consultants within the scope of their employment or other engagement with the Company or its Subsidiaries as applicable and no past or present employee or consultant owns any right, title or interest in or to any Company Intellectual Property created or developed by such employee or consultant in the course of his or her relationship with the Company and its Subsidiaries. To the Knowledge of the Company, no Company Intellectual Property of the Company or any of its Subsidiaries that constitutes a trade secret has been disclosed to any present or former employee or consultant of the Company or to any Person other than pursuant to written nondisclosure agreements pursuant to which such Person is bound pursuant to a valid and enforceable agreement to protect the confidentiality of such trade secret or other Intellectual Property.

(d) To the Knowledge of the Company, the conduct of the business of the Company or any of its Subsidiaries does not infringe, misappropriate or otherwise conflict with any Intellectual Property of any Person and no Person has notified the Company or any of its Subsidiaries in writing (including by way of demand or offer to license) that the Company's or any of its Subsidiary's use of the Company Intellectual Property infringes, misappropriates or otherwise conflicts with the rights of any Person, and, to the Company's Knowledge, there is no reasonable basis for any such claim. To the Company's Knowledge, no Person has infringed, misappropriated or otherwise conflicted with any right or interest of the Company or any of its Subsidiaries with respect to, and no action is pending or to the Knowledge of the Company threatened, which challenges, the validity, enforceability, use or ownership of, any Company Intellectual Property that is owned or has been developed by the Company.

(e) No claims are pending or, to the Company's Knowledge, threatened that any activity of the Company or any of its Subsidiaries now conducted, infringes, misappropriates or otherwise conflicts with the Intellectual Property of any Person

(f) The transactions contemplated by this Agreement shall not impair the right, title or interest of the Company or any of its Subsidiaries in or to any of the Company Intellectual Property, and all of the Company Intellectual Property shall be owned or available for use by the Company and each of its Subsidiaries immediately after the Closing on terms and conditions the same as those under which the Company and each of its Subsidiaries owned or used the Company Intellectual Property immediately prior to the Closing.

(g) To the Company's Knowledge, the computer systems, including the software, firmware, hardware, networks and interfaces (whether general or special purpose), and other similar or related items of automated, computerized, and/or software system(s) (collectively, the "**Systems**") that are used or relied on by the Company or any of its Subsidiaries in the conduct of its business are sufficient in all material respects.

3.18    **Insurance**

(a)    The Company believes that its policies of insurance currently provide all coverage required by law in connection with the operation of the business of the Company and its Subsidiaries. Section 3.18 of the Disclosure Schedule sets forth the following information for each insurance policy that the Company or any Subsidiaries is a party to: (i) a list of the insurance polices relating to the Company and its Subsidiaries which are currently in effect; (ii)

the name of the insurer, the name of the policyholder and the name of each covered insured; (iii) the policy number and the period of coverage; (iv) the amount of coverage, (v) a description of any retroactive premium adjustments or other loss sharing agreements; and (vi) a description of any self-insurance arrangement affecting the Company and its Subsidiaries.

(b)     The Company has made available to the Parent true and correct copies of each of the insurance policies relating to the Company and its Subsidiaries that are currently in effect.

(c)     With respect to each such insurance policy, neither the Company nor any of its Subsidiaries, nor to the Knowledge of the Company, any other party to such policies, is in breach or default thereunder (including with respect to the payment of premiums or the giving of notice) and the Company does not know of any occurrence of any event which, with notice or the lapse of time or both, would constitute such a breach or default or permit termination, modification or acceleration under the policy.

(d)     Except as set forth in Section 3.18(d) of the Disclosure Schedule, to the Knowledge of the Company, there are no claims pending with respect to any of such policies which are likely to exceed the amount of coverage provided by the applicable policy. Neither the Company nor any of its Subsidiaries has received (i) any written notice of cancellation of any such policy or refusal of coverage thereunder, (ii) any written notice that any issuer of such policy has filed for protection under applicable bankruptcy or other insolvency laws or is otherwise in the process of liquidating or has been liquidated or (iii) any other written indication that such policies are no longer in full force or effect or that the issuer of any such policy is no longer willing or able to perform its obligations thereunder.

### 3.19    **Compensation**.

Section 3.19 of the Disclosure Schedule constitutes a full and complete list of each director, officer, employee or consultant of the Company or any of its Subsidiaries whose annual base salary from the Company or its Subsidiaries exceeds $100,000, specifying each individual's name and job designation, and the total amount of base salary and bonus or other cash compensation paid to such individual for calendar year 2004 and the amount of base salary, target bonus (including disclosure regarding how the bonus is calculated) and other cash compensation payable to such individual for calendar year 2005.

### 3.20    **Affiliated Transactions**.

Except as set forth on Section 3.20 of the Disclosure Schedule, there are no loans or leases between the Company or any of its Subsidiaries and any stockholder, director, member or officer thereof or, to the Knowledge of the Company, any member of such officer's, director's or stockholder's family, or to the Knowledge the Company, any Person controlled by such executive officer, director, member or stockholder or his or her family. Except as set forth in Section 3.20 of the Disclosure Schedule, no director or officer of the Company or any of its Subsidiaries nor, to the Knowledge of the Company, any of their respective spouses or family members, owns directly or indirectly on an individual or joint basis any interest in, or serves as an officer or director or in another similar capacity of, any customer, supplier or other organization which has a material business relationship with the Company or any of its

Subsidiaries. Except as set forth in Section 3.20 of the Disclosure Schedule, neither the Principal Stockholders nor any of their Affiliates, nor the Company's and its Subsidiaries' directors and officers has been involved in any business arrangement (excluding employment related arrangements) with the Company or any of its Subsidiaries within the past 12 months and none of the Management Selling Stockholders, the Principal Stockholders or the Stockholders and each of their Affiliates, directors, officers, employees and shareholders, and the Company's and its Subsidiaries' directors, officers, employees, and shareholders owns any asset, tangible or intangible, that is used in the business of the Company or any of its Subsidiaries.

**3.21    Books and Records.**

The minute books of the Company and each of its Subsidiaries contain, in all material respects, accurate records of all corporate actions taken by the directors and stockholders of the Company and each Subsidiary.

**3.22    Brokers, Finders and Advisors.**

The Company has not employed any broker, finder, or investment advisor on its behalf, or incurred any liability for any brokerage or finder's fees or commissions in connection with the Merger.

**3.23    Title to Assets**

Except as set forth in Section 3.23 of the Disclosure Schedule, the Company and its Subsidiaries own, lease, license or have a valid and defensible right to use and have good and valid title to, or a leasehold interest in, all Leased Real Property, machinery, equipment, property, and other tangible and intangible assets used by the Company free and clear of all materiel Liens. Each material tangible asset has been maintained in accordance with normal industry practice and is in good operating condition and repair (ordinary wear and tear excepted).

**3.24    Powers of Attorney.**

Except as set forth in Section 3.24 of the Disclosure Schedule, there are no outstanding powers of attorney executed on behalf of the Company or any of its Subsidiaries

**3.25    Guaranties.**

Except as set forth on Schedule 3.25 of the Disclosure Schedule, neither the Company nor any of its Subsidiaries is a guarantor or otherwise is liable for any liability for borrowed money of any other Person.

**3.26    Chargebacks.**

Section 3.26 of the Disclosure Schedule sets forth a list of all instances since December 31, 2004, in which the aggregate value of Chargeback losses suffered by the Company from a single Merchant customer exceeded $20,000. The Company has handled and processed all Chargebacks in the ordinary course of business consistent with the rules of the Card Associations. To the Knowledge of the Company, there are no pending matters where the aggregate value of Chargebacks likely to be suffered by the Company from a single Merchant customer will exceed $20,000

### 3.27 Product Liability

Neither Company nor any of its Subsidiaries has any liability (and there is no basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against any of them giving rise to any liability) arising out of any injury to individuals or property as a result of the ownership, possession, or use of any product manufactured, sold, leased, or delivered by Company or any of its Subsidiaries which could cause or could reasonably be expected to cause a Material Adverse Effect.

### 3.28 Business Continuity

(a) None of the computer software, computer hardware (whether general or special purpose), telecommunications capabilities (including all voice, data and video networks) and other similar or related items of automated, computerized, and/or software systems and any other networks or systems and related services that are used by or relied on by the Company in the conduct of its business (collectively, the "**Systems**") have experienced bugs, failures, breakdowns, or continued substandard performance in the past 12 months that has caused any substantial disruption or interruption in or to the use of any such Systems by the Company which could cause or could reasonably be expected to cause a Material Adverse Effect.

(b) The Company is covered by business interruption insurance in scope and amount customary and reasonable to ensure their ongoing business operations.

### 3.29 Customers and Suppliers.

Section 3.29 of the Disclosure Schedule lists the twenty five (25) largest customers of Company (on a consolidated basis) for each of the two most recent fiscal years and sets forth opposite the name of each such customer the percentage of consolidated net sales attributable to such customer.

Since the date of the Most Recent Financial Statement, no supplier of Company or any of its Subsidiaries has indicated in writing that it shall stop, or materially decrease the rate of, supplying materials, products or services to the Company, and no customer listed on Section 3.29 of the Disclosure Schedule has indicated in writing that it shall stop, or decrease the rate of, buying materials, products or services from Company or any of its Subsidiaries.

### 3.30 Credit Association Rules

Neither the Company nor any of its Subsidiaries is in material default under violation of any provisions of the rules and regulations of any Card Associations.

### 3.31 Disclosure.

No representation or warranty by the Company in this Agreement, or in any certificate, schedule, or exhibit furnished hereto, contains or contained any untrue statement of material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading, when taken as a whole, and, to the Company's Knowledge, the Company has provided the Parent and Newco with all information which a qualified and experienced investment professional with knowledge of the industry could reasonably be expected to consider material to its evaluation of an investment in and purchase of the Shares.

## ARTICLE IV
## PARENT AND NEWCO REPRESENTATIONS AND WARRANTIES

The Parent and Newco, jointly and severally, represent and warrant to the Company, on the date hereof, as follows:

**4.1** **Organization; Approvals**

Each of the Parent and Newco is duly organized, validly existing and in good standing under the Laws of its state of organization and has the requisite corporate or other power and authority necessary and is in possession of all grants, authorizations, licenses, permits, easements, consents, certificates, approvals and orders ("**Parent Approvals**") necessary to own, lease and operate its properties and to carry on its business as it is now being conducted, and neither the Parent nor Newco has received any written notice of proceedings relating to the revocation or modification of the Parent Approvals.

**4.2** **Authority; Execution and Delivery; Enforceability**

Each of the Parent and Newco has the requisite corporate or other power and authority to execute and deliver this Agreement and the other agreements contemplated hereby, to perform its obligations hereunder and thereunder and to consummate the Merger. The execution and delivery of this Agreement and the other agreements contemplated hereby by the Parent and Newco and the consummation by them of the Merger has been duly and validly authorized by all necessary corporate or other action and no other corporate or other proceedings on the part of the Parent or Newco are necessary to authorize this Agreement and the other agreements contemplated hereby or to consummate the Merger. This Agreement has been, and upon execution the other agreements contemplated hereby will be, duly executed and delivered by, and constitute valid and binding obligations of, the Parent and Newco and, assuming due authorization, execution and delivery by the Company, are and will be enforceable against the Parent and Newco in accordance with their terms, except as enforcement may be limited by general principles of equity whether applied in a court of law or a court of equity and by bankruptcy, insolvency and similar laws affecting creditors' rights and remedies generally.

**4.3** **No Conflicts; Consents**

(a) The execution, delivery and performance of this Agreement and the other agreements contemplated hereby by the Parent and Newco and the consummation of the Merger will not:

(i) conflict with or result in any violation of any provision of any charter, bylaws or similar organizational document adopted by the Parent or Newco;

(ii) conflict with, or result in any a material violation of or a material default (with or without notice or lapse of time or both) under, or give rise to any right of termination, cancellation or acceleration of any obligation, or result in the creation of any Lien upon any of the properties or assets of the Parent or Newco under, or require the consent of any Person under, any provision of any Contract to which the Parent or Newco is a party or by which any of their properties or assets are bound; or

(iii) conflict with or result in any material violation of any Judgment or domestic or foreign Law applicable to the Parent or Newco or their respective properties or assets.

(b) No Consent of, or registration, declaration or filing with, or notice to, or Permit from, any Governmental Entity is required to be obtained or made by or with respect to the Parent or Newco in connection with the execution, delivery and performance of this Agreement and the other agreements contemplated hereby or consummation of the Merger.

### 4.4 Litigation

Neither the Parent nor Newco is a party to any, and there are no pending or, to the knowledge of the Parent or Newco, threatened, legal, administrative, arbitral or other proceedings, claims, actions or governmental or regulatory investigations of any nature against the Parent or Newco seeking to prevent, hinder, modify or challenge the Merger.

### 4.5 Brokers, Finders and Advisors

Neither the Parent nor Newco has employed any broker, finder or investment advisor on its behalf, or incurred any liability for any brokerage or finder's fees or commissions in connection with the Merger.

### 4.6 Investment Representations

(a) Each of the Parent and Newco acknowledges that the Shares have not been registered for offer or sale under the Securities Act or any state securities laws, are not listed for trading on any stock exchange, stock quotation service or other stock market and are not part of a class of securities registered under the Exchange Act. Each of the Parent and Newco understands that the Shares (i) are being sold to the Parent in reliance on exemptions from the registration requirements of the Securities Act and any applicable state securities laws, (ii) are "restricted securities" within the meaning of Rule 144 promulgated under the Securities Act, and (iii) may not be sold, transferred or otherwise disposed of unless subsequently registered under the Securities Act and applicable state securities laws or unless an exemption from registration is available.

(b) Each of the Parent and Newco has such knowledge and experience in financial and business matters in general and with respect to businesses of a nature similar to the business of the Company and its Subsidiaries so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, the acquisition of the Shares. Each of the Parent and Newco is an "accredited investor" as such term is defined in Rule 501(a) of the Securities Act.

(c) The Parent is acquiring the Shares solely for its own account and not with a view to or for resale in connection with any distribution or public offering thereof, within the meaning of applicable securities laws and regulations.

(d) To the extent it believes appropriate prior to the signing of this Agreement, each of the Parent and Newco (i) has received all the information it has deemed necessary to make an informed investment decision with respect to the execution of this

Agreement and the acquisition of the Shares; (ii) has had the opportunity to conduct adequate due diligence and review the information provided or made available to it by the Company or its Representatives; (iii) has had the unrestricted opportunity to make such investigation as it has desired pertaining to the Company and its Subsidiaries and the acquisition of the Shares and to verify the information that is, and has been made, available to it; and (iv) has had the opportunity to ask questions of the Company and its Subsidiaries regarding the Company's and its Subsidiaries' business operations and financial condition.

(e) Notwithstanding anything to the contrary set forth in this Section 4.6, and subject to Section 4.8, nothing set forth in this Section 4.6 shall restrict the Parent or Newco from making any claim for any breach of any of the Company's representations and warranties in accordance with the other terms and conditions set forth in this Agreement.

### 4.7 Newco

Newco is a newly formed wholly owned subsidiary corporation of the Parent that was formed solely for the purpose of being merged into the Company pursuant to the Merger. Newco has not conducted and will not conduct any active trade or business during its existence.

### 4.8 No Knowledge of Misrepresentations or Omissions

Neither James C. Comis III nor Brad Esson have any knowledge that any of the representations and warranties of the Company in this Agreement and the Disclosure Schedule are untrue or incorrect in any material respect, and neither James C. Comis III nor Brad Esson have any knowledge of any material errors in, or material omissions from, the Disclosure Schedule.

### 4.9 No Other Representations

In entering into this Agreement, each of the Parent and Newco has relied solely upon the representations and warranties of the Company set forth in this Agreement.

## ARTICLE V
## ADDITIONAL AGREEMENTS

### 5.1 Public Announcements

The Parent, Newco and the Company shall consult with and obtain the approval of the other Parties before issuing any press release or other public announcement with respect to the Merger or this Agreement and shall not issue any such press release prior to such consultation and approval, except as may be required by Law.

### 5.2 Tax Matters

(a) <u>Tax Returns for Periods Ending on or Prior to Closing Date, Filed After Closing Date</u>. The Parent shall prepare or cause to be prepared and file or cause to be filed all Tax Returns for the Company and its Subsidiaries for all periods ending on or prior to the Closing Date which are to be filed after the Closing Date. The Stockholders' Representative shall be permitted to review, comment and approve each such Tax Return described in the preceding sentence prior to filing, which approval the Stockholders' Representative will not

unreasonably withhold or delay. All such Tax Returns shall be prepared in a manner consistent with the past custom and prior practice of the Company and its Subsidiaries unless specifically required by Law.

(b) <u>Tax Periods Beginning Before and Ending After the Closing Date</u>. The Parent shall prepare or cause to be prepared and file or cause to be filed any Tax Returns of Company and its Subsidiaries for tax periods which begin before the Closing Date and end after the Closing Date. The Stockholders' Representative shall be permitted to review, comment and approve that portion of each such Tax Return related to the taxable period ending on the Closing Date prior to filing, which approval the Stockholders' Representative will not unreasonably withhold or delay. For purposes of this Section, in the case of any Taxes that are imposed on a periodic basis and are payable for a taxable period that includes (but does not end on) the Closing Date, the portion of such Tax that relates to the portion of such taxable period ending on the Closing Date shall (i) in the case of any Taxes other than Taxes based upon or related to income or receipts, be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in the entire taxable period, and (ii) in the case of any Tax based upon or related to income or receipts be deemed equal to the amount which would be payable if the relevant taxable period ended on the Closing Date. Any credits relating to a taxable period that begins before and ends after the Closing Date shall be taken into account as though the relevant taxable period ended on the Closing Date. All determinations necessary to give effect to the foregoing allocations shall be made in a manner consistent with past custom and prior practice of the Company and its Subsidiaries.

(c) <u>Cooperation on Tax Matters</u>.

(i) The Parent and the Stockholders' Representative shall cooperate fully and the Parent shall cause the Company and its Subsidiaries to cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns pursuant to this Section and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the other party's request) the provision of records and information which are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The Parent agrees to retain all books and records with respect to Tax matters pertinent to the Company and its Subsidiaries relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority.

(ii) The Parent and the Stockholders' Representative further agree, upon request, to provide the other party with all information that either party may be required to report pursuant to the Code and all Treasury Department Regulations promulgated thereunder.

(d) <u>Refunds and Tax Benefits</u>. If any Tax refunds that are received by the Parent or the Company or any of its Subsidiaries or any amounts credited against Taxes to which the Parent or the Company and any of its Subsidiaries become entitled, that relate to Tax periods or

portions thereof ending on or before the Closing Date exceeds the portion, if any, of such refunds or credited amounts that were included as assets receivable in the Final Working Capital, the Parent shall pay over to the Stockholders' Representative any such excess within fifteen (15) days after receipt or entitlement thereto, net of any Taxes imposed upon the Parent by reason of the receipt of such excess. The Parties intend that any payments from the Parent to the Stockholders' Representative under this Section 5.6(d) shall be treated as an adjustment to the Purchase Price of the Shares for purposes of all applicable Laws, including Tax Laws.

(e) <u>Tax Audits</u>. The Parent agrees (i) to furnish to the Stockholders' Representative copies of all correspondence received from any Governmental Entity in connection with any audit, litigation or other proceedings relating to the Tax Returns of the Company or any of its Subsidiaries, and (ii) to cooperate, to the extent reasonably requested by the Stockholders' Representative, in connection with any audit, litigation or other proceedings in respect to the Taxes of the Company or any of its Subsidiaries in each case for taxable periods beginning prior to the Closing Date and for Taxes for which Stockholders have any liability under the provisions of this Agreement. The Stockholders' Representative, in its sole discretion, shall have the right to participate in or control any audit, examination, litigation or other proceedings by any Governmental Entity and contest and defend against any assessment, notice of deficiency or other adjustment or proposed adjustment relating to or with respect to Taxes or Tax Returns for any period ending on or prior to the Closing Date for which Stockholders have any liability under the provisions of this Agreement and shall have full control over the resolution or settlement of any such matters; <u>provided</u>, <u>however</u>, that in the event that any such adjustment would have an adverse effect on the Company or any of its Subsidiaries for a period ending after the Closing Date, the Stockholders' Representative (i) shall permit the Parent to participate in the proceeding to the extent the adjustment may affect the Tax liability of the Company or any of its Subsidiaries for a period ending after the Closing Date, and (ii) shall not settle or otherwise compromise such proceeding without the prior written consent of the Parent, which shall not be unreasonably withheld or delayed. To the extent the Stockholders' Representative does not assume full control over any such matters, the Parent shall use commercially reasonable efforts to defend positions taken on Tax Returns for periods ending on or prior to the Closing Date and shall keep the Stockholders' Representative informed of the progress of any such proceedings and shall not settle or otherwise compromise such proceeding without the prior written consent of the Stockholders' Representative, which shall not be unreasonably withheld or delayed. To the extent that any assessment, notice of deficiency or other adjustment or proposed adjustment related to or with respect to the Tax Returns for any taxable period other than a period ending on or prior to the Closing Date would require indemnification pursuant to Sections 8.2 or 8.3, the Parent (A) shall permit the Stockholders' Representative to participate in the proceeding, and (B) shall not settle or otherwise compromise such proceeding without the prior written consent of the Stockholders' Representative, which shall not be unreasonably withheld or delayed.

5.3  **Indemnification for Taxes**.

Notwithstanding anything set forth in Section 8.5 or 8.7 of this Agreement, the Principal Stockholders and the Management Selling Stockholders shall pay or cause to be paid, and shall indemnify Parent and Newco and protect, save and hold each of Parent and Newco harmless from and against, on a Grossed-Up Basis, any and all amounts for any loss, claim,

liability, expense or other damage attributable to (i) all Taxes(or the non-payment thereof) of the Company and any of its Subsidiaries for all taxable periods ending on or before the Closing Date and the portion through the end of the Closing Date for any taxable period that includes (but does not end on) the Closing Date ("**Pre-Closing Tax Period**"), (ii) all Taxes of any member of an affiliated, consolidated, combined or unitary group of which the Company or any of its Subsidiaries (or any predecessor of any of the foregoing) is or was a member on or prior to the Closing Date, including pursuant to Treasury Regulation Section 1.1502-6 or any analogous or similar state, local or foreign law or regulation, and (iii) any and all Taxes of any person (other than the Company and its Subsidiaries) imposed on the company or any of its Subsidiaries as a transferee or successor, by contract or pursuant to any law, rule or regulation which Taxes relate to an event or transaction occurring before the Closing; provided, however, that in the case of clauses (i), (ii) and (iii) above, Principal Stockholders and the Management Selling Stockholders shall be liable only to the extent that such Taxes exceed the amount, if any, reserved for such Taxes by the Company prior to Closing (excluding any reserve for deferred Taxes established to reflect timing differences between book and tax income) (rather than in any notes thereto) (the "**Closing Tax Reserve**")and taken into account in determining any Post-Closing Adjustment. If the Closing Tax Reserve is greater than such Taxes then the Company shall, within [60] days of filing a Tax Return showing the amount of such Taxes (the "**Post Closing Tax Return**"), pay the difference between the Closing Tax Reserve and the actual Taxes to the Stockholders' Representative for distribution to the Stockholders. The Principal Stockholders and the Management Selling Stockholders will make any payments due under this Section 5.3 within [60] of the filing of the Post Closing Tax Return.

  5.4  **Employment of Employees**.

  The Parent and/or its Affiliates will retain a sufficient number of employees of the Company and its Subsidiaries to avoid application of the requirements of the Workers Adjustment Retraining and Notification Act with respect to pre-Closing notifications to employees of the Company or any of its Subsidiaries and to avoid any liability on the part of the Stockholders to employees who may be terminated in connection with the Merger.

**ARTICLE VI**
**CONDITIONS OF CLOSING**

  6.1  **Conditions to Obligations of Each Party**.

  The respective obligations of each party to consummate the Merger shall be subject to the satisfaction at or prior to the Closing Date of the following conditions:

  (a)  <u>No Order</u>. No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, executive order, judgment (whether temporary, preliminary or permanent) which restricts, prevents or permanently prohibits the consummation of the Merger.

  (b)  <u>No Action, Suit, Proceeding</u>. No action, suit or proceeding shall be pending or threatened before any Governmental Entity wherein an unfavorable injunction, judgment, order, decree, ruling, or charge would (i) prevent consummation of the Merger, (ii) cause the Merger to be rescinded following consummation, (iii) adversely affect the right of

Surviving Corporation to own the former assets, to operate the former business, and to control the Company or the former Subsidiaries of the Company, or (iv) adversely affect the right of any of the Company or the former Subsidiaries of the Company to own its assets and to operate its business (and no such injunction, judgment, order, decree, ruling, or charge shall be in effect).

(c) <u>Governmental Authorizations</u>. All actions by or in respect of or filings with any Governmental Entity, required to permit the consummation of the Merger shall have been made or obtained.

**6.2** **Additional Conditions to Obligations of the Parent and Newco**.

The obligations of the Parent and Newco to consummate the Merger are also subject to the satisfaction at or prior to the Closing of the following conditions, any one or more of which may be waived by the Parent and Newco:

(a) <u>Representations and Warranties</u>. (i) The representations and warranties of the Company contained in this Agreement that are qualified as to Material Adverse Effect shall be true and correct as of the date of this Agreement and as of immediately prior to the Closing (other than representations and warranties which address matters only as of a particular date, in which case such representations and warranties shall be true and correct, on and as of such particular date), with the same force and effect as if then made; and (ii) the representations and warranties of the Company contained in this Agreement that are not qualified as to Material Adverse Effect shall be true and correct as of the date of this Agreement and as of immediately prior to the Closing (other than representations and warranties which address matters only as of a particular date, in which case such representations and warranties shall be true and correct, on and as of such particular date), with the same force and effect as if then made, and the Parent and Newco shall have received a certificate to such effect signed by an authorized officer of the Company.

(b) <u>Agreements and Covenants</u>. The Company shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date and the Parent and Newco shall have received a certificate to such effect signed by an authorized officer of the Company.

(c) <u>Escrow Agreement</u>. The Escrow Agreement shall have been executed by all Parties thereto.

(d) <u>Resignations</u>. The Parent and Newco shall have received the resignations, effective as of the Closing Date, of each director and officer of the Company and each of its Subsidiaries, other than those whom the Parent shall have specified in writing at lease five (5) Business Days prior to the Closing Date.

(e) <u>FIRPTA</u>. The Company shall have delivered to the Parent and Newco a non-United States real property holding company affidavit dated as of the Closing Date and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Internal Revenue Code.

(f) <u>Employment Agreements</u>. Each of Bill Blakey, Michael Kopp, Scott McFarland, Charley Whitely, Manny Ferriera, Richard Anthony, Dawn Murray shall have entered into employment agreements with the Company relating to their employment following the Closing Date, which employment agreements shall be in form and substance and on terms and conditions that are reasonably satisfactory to the Parent and Newco.

(g) <u>Bonus Payments</u>. The Parent and Newco shall be satisfied that the Company shall have fulfilled all of its payment obligations under the Executive Bonus Plan, including but not limited to the payment in full, prior to the Closing Date, of all bonuses earned and due to eligible recipients that relate to any periods prior to the Closing Date.

(h) <u>D&O Tail Insurance</u>. The Parent and Newco shall be satisfied that the Company shall have obtained tail directors and officers insurance for all periods prior to the Closing Date, in form and substance satisfactory to the Parent and Newco.

(i) <u>Cash At Closing</u>. The immediately available cash of the Company in the Company's bank accounts described in Section 6.2(i) to the Disclosure Schedule on the Closing Date (the "<u>Required Closing Cash</u>") shall be at least equal to [" ___] and the Company shall have provided a certificate executed by the Chief Operating Officer of the Company to the effect that the Required Closing Cash was at least equal to such amount.

(j) <u>Opinion of Counsel</u>. The Parent and Newco shall have received from Jenkens & Gilchrist, P.C., independent counsel to the Company, an opinion dated as of the Closing Date, substantially in the form attached hereto as Exhibit B.

(k) <u>Company Stockholder Approval</u>. The Company's stockholders shall have unanimously adopted and approved this Agreement, the Merger, and all other actions for which stockholder approval is required under applicable Law and the Company shall not have received any written notice from any stockholder notifying the Company that such Stockholder will be exercising any dissenters' rights with respect to this Agreement.

(l) <u>Officer's Certificate</u> The Company shall have delivered to the Parent and Newco:

(i) the Company Certificate and Subsidiary Formation Documents, certified by the Secretary of State of each of their jurisdictions of organization; and

(ii) (A) copies of the Company's resolutions of its Board of Directors authorizing and approving this Agreement, the other agreements contemplated hereby and all of the transactions and agreements contemplated hereby and thereby, (B) the Company Bylaws and the Subsidiary Governance Documents, and (C) the names of the officer or officers of the Company authorized to execute this Agreement and any and all documents, agreements and instruments contemplated herein, all certified by any authorized officer of the Company to be true, correct, complete and in full force and effect and unmodified as of the Closing Date.

(iii) A certificate to the effect that each of the conditions specified above in <u>Section 6.1</u> and <u>Section 6.2</u> have been satisfied in all respects.

(m)  <u>Material Consents</u>.  The Company shall have obtained all of the third party consents set forth on <u>Schedule</u> ___.

**6.3  Additional Conditions to Obligations of the Company.**

The obligations of the Company to consummate the Merger are also subject to the satisfaction at or prior to the Closing of the following conditions, any one or more of which may be waived by the Company:

(a)  <u>Representations and Warranties</u>.  (i) The representations and warranties of the Parent and Newco contained in this Agreement that are qualified as to material adverse effect shall be true and correct as of the date of this Agreement and as of immediately prior to the Closing (other than representations and warranties which address matters only as of a particular date, in which case such representations and warranties shall be true and correct, on and as of such particular date), with the same force and effect as if then made; and (ii) the representations and warranties of the Parent and Newco contained in this Agreement that are not qualified as to material adverse effect shall be true and correct as of the date of this Agreement and as of immediately prior to the Closing (other than representations and warranties which address matters only as of a particular date, in which case such representations and warranties shall be true and correct, on and as of such particular date), with the same force and effect as if then made, and the Company shall have received a certificate to such effect signed by an authorized officer of the Parent and Newco.

(b)  <u>Agreements and Covenants</u>.  Each of the Parent and Newco shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date and the Company shall have received a certificate to such effect signed by an authorized officer of the Parent and Newco.

(c)  <u>Escrow Agreement</u>.  The Escrow Agreement shall have been executed by all parties thereto.

(d)  <u>Opinion of Counsel</u>.  The Company shall have received from Kirkland & Ellis LLP, independent counsel to the Parent and Newco, an opinion dated the Closing Date, substantially in the form attached hereto as <u>Exhibit C</u>.

(e)  <u>Officer's Certificate</u>.  The Parent and Newco shall have delivered to the Company:

(i)  the Certificate of Incorporation or similar organizational documents of each of the Parent and Newco and all amendments thereto, certified by the Secretary of State of its jurisdiction of organization; and

(ii)  (A) copies of each of the Parent's and Newco's resolutions of its Board of Directors or other governing body authorizing and approving this Agreement, the other agreements contemplated hereby and all of the transactions and agreements contemplated hereby and thereby, (B) the Bylaws or similar governing documents of the Parent and Newco, and (C) the names of the officer or officers of the Parent and Newco authorized to execute this

Agreement and any and all documents, agreements and instruments contemplated herein, all certified by an authorized officer of the Parent and Newco to be true, correct, complete and in full force and effect and unmodified as of the Closing Date.

## ARTICLE VII
## POST CLOSING COVENANTS

### 7.1 Records; Cooperation

After the Closing Date, upon reasonable request from the Stockholders' Representative (at the Stockholders' Representative expense), the Parent, the Company and its Subsidiaries and their Representatives will cooperate with the Stockholders' Representative and its Representatives for purposes of permitting the Stockholders' Representative to address and respond to any matters involving the Stockholders that arise as a result of or otherwise relate to the Stockholders prior ownership of the Company, whether or not related to this Agreement, including, without limitation, any claims made by or against a Stockholder or any of their Affiliates or Representatives, whether involving any Governmental Entity or other Person.

### 7.2 Employee Benefit Matters

(a) For all purposes under the employee benefit plans of the Parent and its Affiliates providing benefits after the Closing Date, each employee of the Parent or its Affiliates who was, as of the Closing Date, an employee of the Company or any of its Subsidiaries shall be credited with his or her years of service with the Company or any of its Subsidiaries, as applicable, before the Closing Date, to the same extent as such employee was entitled, before the Closing Date, to credit for such service under any similar Plans, except to the extent such credit would result in a duplication of benefits. Notwithstanding the preceding sentence, no such employees will be given credit for years of service with the Company or any of its Subsidiaries on or prior to the Closing Date for the purpose of benefit accrual under a "defined benefit pension plan" (within the meaning of Section 3(35) of ERISA). In addition, and without limiting the generality of the foregoing each employee shall be immediately eligible to participate, without any waiting time, in any and all employee benefit plans sponsored by the Parent and its Affiliates for the benefit of employees (such plans, collectively, the "**New Plans**") to the extent coverage under such New Plan replaces coverage under a comparable Plan in which such employee participated immediately before the Closing Date (such Plans, collectively, the "**Old Plans**");

(b) Each individual entitled to continuation coverage under Section 4980B of the Code or Part 6 of Title I of ERISA ("**COBRA**") from a Plan as a result of a qualifying event or events that occurred prior to, on or after the Closing Date shall be the sole responsibility of the Parent and its Affiliates.

### 7.3 Further Assurances

In case at any time after the Closing Date any further actions are necessary or desirable to carry out the purposes of this Agreement, each of Parent, Newco, the Company, the Principal Stockholders and the Management Selling Stockholders will take such further actions (including the execution and delivery of such further instruments and documents) as any other